(89 App. Div. 61.)

CURTIS et al. v. NATALIE ANTHRACITE COAL CO.

(Supreme Court, Appellate Division, First Department.    December 18, 1903.)

1. CORPORATIONS—REORGANIZATION—ASSUMPTION OF DEBT OF OLD COMPANY—ULTRA VIRES.

Const. Pa. art. 16, § 7, provides that the indebtedness of corporations shall not be increased, except in pursuance of general law, nor without the consent of persons holding the largest amount in value of the stock, at a meeting to be held after 60 days' notice given in pursuance of law. The Pennsylvania statute under which a reorganized company was incorporated provided that the purpose for which the corporation was established should be specified in its articles, and it should not appropriate its funds for any other purpose.    The certificate of incorporation recited that the company was organized "for the purpose of mining and selling coal and transporting the same to market."    Held, that a contract by which the company assumed an indebtedness of its predecessor arising from the acceptance of drafts by a customer, for which coal was to be afterwards delivered, was not ultra vires; the constitutional prohibition having no application to an indebtedness incurred in the line of business for which the corporation was organized.

2. SAME—EXECUTED CONTRACT—ESTOPPEL.

Where a reorganized company induces a customer to continue handling its output, and also to continue advances to it, on the promise to assume and pay an indebtedness of the old company, all of which the customer does, the new company is estopped from pleading that its assumption of the debt was ultra vires.

3. SAME—KNOWLEDGE OF DIRECTORS—PRESUMPTION.

The directors of a reorganized company are chargeable with knowledge of the course of business between it and a customer involving an as-

sumption by the company of an indebtedness of its predecessor, whereby the customer was induced to continue handling the company's output, and to continue making advances to it.

**4. SAME—RATIFICATION.**

A coal mining company was accustomed to receive advances, by way of an acceptance of drafts before coal was delivered, from a customer, who, as a retail dealer, had built up a market for its product. On the reorganization of the company, the customer was induced to continue handling its product, and to continue making advances,' by a promise of the reorganized company's president that it would assume an indebtedness of the old company arising from such advances. The customer fulfilled his part of the obligation, and the officers and directors of the company received the benefit thereof, with knowledge of the contract of assumption. No formal action, however, was taken by the board of directors. The indebtedness of the old company was not carried forward into the books of the new one, and there was nothing in the records of the new company to show the assumption of the debt, though the indebtedness was allowed as a credit to the customer in a statement of his account made by the new company. *Held*, that the new company ratified the action of its president, and was liable for the indebtedness.

Van Brunt, P. J., and Ingraham, J., dissenting.

Appeal from Trial Term, New York County.

Action by Grove D. Curtis and another against the Natalie Anthracite Coal Company. From a judgment for plaintiffs (80 N. Y. Supp. 603), defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Arthur J. Baldwin, for appellant.

George C. Austin, for respondents.

LAUGHLIN, J. The decision, as made, is based upon a finding that the defendant assumed an indebtedness of $17,853.02 which was due°and owing from the Penn Anthracite Coal Company to the plaintiffs on the 1st day of April, 1895. The correctness of the decision in this regard is the single question presented on the appeal.

The Penn Company was organized on the 4th day of September, 1889, under the laws of Pennsylvania. It was engaged in mining and selling coal. Its collieries were at Natalie, Pa., but it maintained an office for the sale of coal at 143 Liberty street, New York City. The collieries were purchased from one Packer, and the title taken in the name of Nathaniel Taylor, the president of the company, who, after giving a purchase-money mortgage back, conveyed the property to the company. The plaintiffs were engaged in buying and selling coal in the New York and adjacent markets. From the commencement of the year 1893 they were the principal purchasers of coal from the Penn Company, and had built up and established an extensive trade in that coal in the city of New York and vicinity. They had purchased and sold during this period about 500,000 tons of coal at a cost of about $2,000,000. The establishment of a market for the coal was attended with difficulty, on account of the fact that "at sight" it would not sell, as the president testified. It had been their custom, when the company needed credit, to accept its drafts, which the company had discounted, and the company paid these acceptances by subsequent deliveries of coal. The balance of

account owing to the plaintiffs from the Penn Company on the 1st day of April, 1895, on account of such acceptances, over and above the coal delivered, was the amount already stated. It appears that some bonds of the Penn Company which had not been paid for, and which were presumably secured by mortgage upon the property, were held by Baltimore parties who had become involved in financial difficulties. These bonds were regarded by the company as a cloud upon the title to its property. The affairs of the company were carefully investigated by the principal creditors and board of directors, and, after such investigation, it was agreed between them that Taylor should confess judgment in an action for the foreclosure of the mortgage, both individually and as president of the company, and that the property should be sold, and a new company organized to take title and continue the business. Judgment by confession was accordingly entered on the 31st day of December, 1894. The property was purchased on the foreclosure sale by one Lazear, trustee, representing four banks (the principal creditors of the company), and one of the stockholders and bondholders. The trustee took title by two deeds—one dated either January 7 or February 15, and the other dated February 6, 1895, respectively. About this time proceedings were instituted for the organization of a new company, which resulted in the incorporation of the defendant under the laws of Pennsylvania on the 15th day of February, 1895. The original capital stock of the company was 50 shares, subscribed for by 5 stockholders, each taking 10 shares, and they were named as the directors. The first meeting of the stockholders and directors was held on the 4th day of March, 1895. On the same day the directors and stockholders agreed to increase the capital stock to $2,000,000, and accepted a proposition from the trustee to convey the title which he had acquired to the company in consideration of the issue to him of the entire capital stock and an equal amount of bonds. At the same time the directors executed assignments of their stock in blank, and at the next meeting, on March 12, 1894, the directors and officers resigned, successively, and new directors were elected in their places. The board of directors was increased to seven. Taylor was elected a director, and on the same day elected president of the defendant. The other directors, with one exception, had been directors of the old company. On the 1st day of April, 1895, the trustee deeded the lands to the new company. The stock and bonds of the new company were issued to Lazear. The facts do not clearly appear, but it is to be inferred that he transferred all the stock to Taylor, who was the principal stockholder of the old company, with the exception of that necessary to be held by the other directors, and that the bonds were distributed to the parties interested in the mortgage which was foreclosed, instead of Lazear being required to pay his bid in cash and to other creditors of the old company. The Penn Company owned about $100,000 worth of personal property, used in working its mines and placing the products thereof upon the market. This property was not included in the deeds, but it seems to have been assumed that the defendant was to become the owner thereof. The only explanation is that given by the president, which

is that they were conveying it to themselves, and that it was regarded by them as the same company. The 1st day of April, 1895, was fixed as the day when the new company was to take possession of the mines and other property and business, and it did take possession on that day. On the 26th day of June, thereafter, a resolution was adopted by the board of directors for the purchase of the personal property from the trustee; but the defendant at that time was, and had been since April 1st, in complete possession thereof, and it does not appear that anything further was done under that resolution. The old company continued business as usual until the 1st day of April, 1895, at which time the business was taken up and continued by the new company without a break. Taylor, the president, testified concerning the transaction: "We were conveying it to ourselves. We were the same company. There was no change in the company;" that the plaintiffs were the largest creditors at the time of the transfer; that it was fully understood and agreed among the directors and bondholders of the new company before he confessed judgment that the new company should assume and pay the outstanding obligations of the old company, and that all other claims against the old company, except claims "held by the people interested in the company itself," were subsequently paid by the new company. The practice of the old company, on delivering coal to the plaintiffs on payment of their acceptances, was to forward receipted bills for the coal with the bills of lading. After the 1st of April, 1895, the new company continued to ship coal to the plaintiffs, accompanying the bills of lading with receipted bills as theretofore, except that they were made out and receipted in the name of the new company. Up to this time there had been no communication between the new company and the plaintiffs concerning the reorganization, or concerning the purchase and shipment of coal. The new company continued to occupy the offices of the old, and continued in its employ the same sales agent and employés generally. Taylor had had general charge and management of the business of the old company, making his headquarters at the New York office, and he continued to exercise like functions with the new company. Upon the receipt by the plaintiffs of the first of these bills, made out and receipted in the name of the new company, the plaintiff Blaisdell called upon Taylor at the defendant's office in New York to ascertain what it meant. The testimony of Blaisdell and Taylor is in substantial accord as to what took place at that interview, and is uncontradicted. It is to the effect that Blaisdell said to Taylor that plaintiffs had been buying coal right along, and giving their acceptances to the Penn Company, and now they had received a receipted bill from the Natalie Company, and asked whether there had been any change in the company, to which Taylor replied that there had been a change, but, so far as the plaintiffs were concerned, it would not affect them, and further explained by saying:

"Owing to complications connected with the early promotions of the company down in Baltimore, our people, after considerable deliberation, have deemed it wise to foreclose and organize a new company. * * * Now, Mr. Blaisdell, there will be no change in your method of doing business with

us. We will have the same sales agent. You will deal with me just the same as you have in the past. You will get your coal just the same as you have in the past. \* \* \* All your acceptances will be filled with coal, just as though there had been no change whatever. \* \* \* Mr. Blaisdell, you must know that you are just as important to us as we are to you, because you have boats, and we have no boats to handle the coal around the harbor. You have the trade, and we have no trade, and our coal is very difficult to handle in New York or anywhere else. It has excellent burning qualities, but at sight will not sell, and you made a market for it, and we want you to continue to handle it, because we need you."

That to this Blaisdell replied, "If it is all right about these acceptances, we will go on doing business as we have in the past;" that Taylor then said:

"You need not worry one moment. You will deal with just the same people you have dealt with before, and the business will be conducted just the same as it was before."

And upon Blaisdell expressing satisfaction with this, Taylor further stated that plaintiffs were an exception to all the other people to whom the company had sold coal, in that they had never made a claim for short weight, or asked a reduction on the bills. Blaisdell further testified—and this is not controverted—that he asked Taylor if it would be necessary for plaintiffs to consult a lawyer for their protection, to which the latter replied:

"Not at all. You are dealing with the same people. The coal will be delivered just the same as it had been before, providing you assist us in the future, and we will wipe out this whole debt in a short time."·

The next acceptance was given by the plaintiffs to the defendant on the 19th day of June, 1895, for $5,000, which the defendant discounted, and used the proceeds in its business. In the meantime the defendant had continued to ship coal to the plaintiffs, accompanying the bills of lading with receipted bills as theretofore, thereby reducing the indebtedness of the old company to the plaintiffs to the sum of $2,514.64, and neither presenting any bill showing an indebtedness on the part of the plaintiffs to it, or demanding payment for the coal. The business thereafter was continued in the same manner, the plaintiffs from time to time giving the defendant their acceptances, and the defendant forwarding receipted bills for coal. It was stipulated that there was nothing in the books of the new company to show that the balance owing to the plaintiffs by the old company in April, 1895, was carried over. The minutes of the secretary contained no action of the directors respecting it, and no mention of the arrangement for its payment made with the plaintiffs by the president. It appears, however, as a credit of a balance due to the plaintiffs on the 31st day of March, 1895, on a statement of account rendered to them by the defendant about the 14th day of May, 1896. Regular monthly meetings of the board of directors were held, at which the treasurer's report for the preceding month was read, approved, and ordered filed. Most of these meetings were held in Pittsburgh, which the charter of the company fixed as its place of business. One meeting of the directors was held in the New York office on the 25th day of September, 1895. None of the treasurer's reports were produced, and nothing appears as to their contents. In March, 1897, a conversa-

tion took place at the New York office between the plaintiff Blais-
dell, the president of the company, and Mr. Wardrop, who was the
vice president and a director of the defendant, and chairman of the
executive committee consisting of five members. According to the
testimony of Blaisdell and Taylor, the account between the plaintiffs
and defendant was examined, and it was found that the amount due
the plaintiffs at that time was $4,000, and in arriving at this balance
the plaintiffs were credited with the indebtedness of the old company.
Taylor stated that the company was in pressing need of money to pay
its operatives, and he desired the plaintiffs to give further advances.
Mr. Blaisdell agreed that the plaintiffs then would give their accept-
ance for $3,000, and a short time thereafter for $2,500. This conver-
sation is undisputed. In the fall of 1897 the defendant went into
the hands of a receiver. During the continuance of these business
transactions between the plaintiffs and the defendant, it does not ap-
pear that the defendant in any manner repudiated the agreement by
which the plaintiffs were induced to continue to handle the defend-
ant's coal upon the understanding that the defendant was to pay the
balance owing by the old company, or that the defendant in any man-
ner repudiated the receipts accompanying the delivery of coal, or
questioned the accounts that had been rendered by it to the plain-
tiffs. Between the 1st of April and the 6th of May, 1895, it appears
that there were eight deliveries of coal made to the plaintiffs in the
name of the old company of the value of $3,197.94. This coal was
mined prior to the 1st day of April. The evidence is rather indefinite
as to how it came to be shipped in the name of the old company; but
the fair inference is that it was not only mined, but shipped from the
mine, or arrangements made for shipping it, prior to the 1st day of
April. The sale of this coal does not appear to have been entered on
the books of the new company, but it is charged to the plaintiffs on
the account rendered by defendant May 14, 1896. On the 30th day of
April, 1895, a time draft drawn on the plaintiffs in favor of the old
company for $4,100 was accepted by them, and subsequently paid.
In said account of May 14, 1896, the plaintiffs are credited with the
payment of this acceptance as a payment to the defendant. All of
the first directors, and those who constituted a majority of the board
thereafter, testified that there was no agreement by the board of
directors, for themselves or for the defendant, to assume this indebt-
edness, and that they did not authorize any one to assume or agree
to pay the same; but they did not deny knowledge of the facts al-
ready stated, nor did they expressly deny that there was an under-
standing prior to the confession of judgment against the old company
that these and other obligations were to be assumed and paid by the
new company, or that, pursuant to such understanding, all of such
other obligations have been paid by the defendant.

The Constitution of Pennsylvania (article 16, § 7) provides, among
other things, that:

"The stock and indebtedness of corporations shall not be increased except
in pursuance of general law, nor without the consent of persons holding the
larger amount in value of the stock first obtained, at a meeting to be held,
after sixty days' notice, given in pursuance of law."

The statute of Pennsylvania under which the defendant was incorporated expressly requires that:

"The purpose for and the place within which said corporation is established shall be distinctly and definitely specified in the articles of association, and such corporation shall not direct its operations or appropriate its funds for any other purpose."

The certificate of incorporation of the defendant shows that it was organized for the "purpose of mining and selling coal and transporting the same to market." Its by-laws provided, among other things, that :·

"No debt or liability beyond that incurred in the ordinary business transactions of the company shall be contracted by an officer of the company without the consent of a majority of all the directors."

Concerning the powers and duties of the president, the by-laws provide that it shall be his duty "to have a general oversight over all the different departments of the company, and to be responsible for their efficient and economical management"; that he should countersign all checks and obligations issued by the treasurer, if he found them correct and proper, and should preside at the meetings of the board" of directors, and should at each of such meetings present a condensed statement in writing of the operations and affairs of the company, and make such recommendations as he deems for the best interests of the company. The president of the defendant, in answer to a question as to what were his general duties as president, and what general duties he performed, testified that the corporation was not run by an executive board, nor by committee, but by the officers; that he was experienced, while the others were amateurs, in the mining business, and that whenever there was anything to determine it was determined by him. He further testified that the vice president and secretary and treasurer and all the officers of the defendant knew that the defendant was delivering coal to the plaintiffs on account of their prior acceptances for the old company, and that the board of directors knew that he had made the proposition to the plaintiffs that, if they would continue business relations with the new company as with the old, the old indebtedness would be paid by the defendant.

There is no force·in the contention that the contract by which this indebtedness was assumed was ultra vires, as prohibited by the Constitution or statutory law of Pennsylvania already quoted. The contract was made concerning the very business for which the defendant was incorporated, and with a view to further its interests. It was therefore a contract made within the scope of the business of the defendant, as stated in the articles of incorporation. The constitutional provision prohibiting the increase of indebtedness of a corporation without the consent of the holders of a majority of the stock, given pursuant to general laws to be enacted by the Legislature regulating the same, surely can have no application to an indebtedness incurred in the line of business for which the corporation has come into existence. Hardware Company v. Phelan, 128 Pa. 110, 18 Atl. 428. Moreover, even if this contract were ultra vires, the defendant, after having made and received and retained the benefits of it, cannot be heard to interpose that as a defense. Whitney Arms Co. v. Barlow,

38 N. Y. Super. Ct. 554; Woodruff v. Erie R. Co., 93 N. Y. 609;
Holm v. Claus Lipsius Brewing Company, 21 App. Div. 204, 47 N. Y.
Supp. 518; Rider Life Raft Co. v. Roach, 97 N. Y. 381; Munson v.
Magee, 161 N. Y. 182, 55 N. E. 916. See, also, Ellsworth v. St. L.,
A. & T. H. R. Co., 98 N. Y. 553. It is a fully executed contract on
the part of the plaintiffs, and it can be enforced against the defendant,
even though there was no authority to make it.

The board of directors left the making of contracts to the presi-
dent. There can be no question but that, as the managing agent of
the company, he had authority to make contracts for the sale of the
defendant's coal. He acted within this authority. Neither his good
faith nor that of the plaintiffs is or can be questioned, on the evidence
before us. He deemed it of great importance to the defendant that
the relations existing between the old company and the plaintiffs
should be continued by the new company, and the soundness of his
judgment in that regard is beyond question. As an inducement for
the plaintiffs to continue to purchase and find a market for the defend-
ant's coal, and to insure the continuance of the customers who were
already familiar with the character of this kind of coal, he, after assur-
ing plaintiffs that the parties in interest were the same, and that they
might rely upon the agreement without consulting counsel, offered to
pay the indebtedness of the old company to the plaintiffs. This was
not an attempt to bind the new company, without consideration, to
pay an indebtedness of the old, but it was a contract for the benefit of
the new company, no different than if the plaintiffs had exacted as
a condition of handling the defendant's coal that the defendants
should pay them a certain sum of money. The advisability of making
such payment would be a matter of sound business judgment. The
importance to the company of having the plaintiffs handle its coal
might warrant the payment of even a much larger sum. Hence the
contract may be one which the president of the company, in the cir-
cumstances, was authorized to make in the first instance, but it is
not necessary to decide that question. Assuming that he was not au-
thorized to make the contract, I think the evidence is overwhelming
that his action in so doing has been ratified, and that the company is
liable thereon. The company has not only received the benefit of
having the plaintiffs continue to handle its coal upon the strength of
this agreement, but it has received advances of money made by the
plaintiffs in reliance thereon. The express testimony is that all of the
officers and the board of directors had knowledge of the contract of
assumption. Furthermore, they are chargeable with such knowledge,
based upon the course of business between the parties. When they
accepted and received the benefits of a contract procured by their
agent, they are presumed to know the terms and conditions upon
which he negotiated the same. The facts that there has been no
formal action by the board of directors, that the indebtedness has not
been carried forward onto the books of the new company, and that
there is nothing in the records of the new company to show the as-
sumption, are not sufficient to relieve the defendant, a business cor-
poration, from liability, when its officers and board of directors had
knowledge of the facts, or are chargeable with knowledge thereof,

and, with such knowledge, retained the benefits of the contract, and continued their business relations with the plaintiffs without repudiating the alleged unauthorized contract. Hall v. Herter Bros., 90 Hun, 280, 35 N. Y. Supp. 769; Alexander v. Brown, 9 Hun, 641; Davis v. Harvey Steel Company, 6 App. Div. 166, 39 N. Y. Supp. 791; Cone v. Empire Plaid Mills, 12 App. Div. 314, 42 N. Y. Supp. 160; Quee Drug Co. v. Plaut, 55 App. Div. 87, 67 N. Y. Supp. 10; Matthews v. Hardt, 79 App. Div. 570, 80 N. Y. Supp. 462; Munson v. Magee, supra; Cunningham v. M. S. & F. C. R. Co., 63 Hun, 439, 18 N. Y. Supp. 600.

It follows that the judgment should be affirmed, with costs.

PATTERSON and HATCH, JJ., concur.

INGRAHAM, J. (dissenting). I do not agree to the affirmance of this judgment. The action was tried before the court without a jury, and the court found that prior to the 1st of April, 1895, the Penn Anthracite Coal Company was operating certain mines in the state of Pennsylvania, and to this corporation the plaintiffs had made advances, to be repaid by coal to be subsequently shipped, of which there was due on the 1st of April, 1895, the sum of $17,853.02; that prior to that date the property of the company had been sold under the foreclosure of a mortgage, and acquired by the defendant, the officers of the new company were same persons who had been officers of the old company, and they continued to operate the mines after they were acquired by the new company; that about the 6th of April, 1895, one of the plaintiffs had a conversation with Nathaniel Taylor, president of the defendant company, "wherein said Taylor, on behalf of the defendant company, promised the said Blaisdell that if plaintiffs would continue to handle their coal in the New York market, and to give the defendant the same financial accommodations and other aid that they had given to the old company, the defendant company would deliver to plaintiffs sufficient coal to wipe out the old debt by deliveries of coal or otherwise. And said Blaisdell, on behalf of plaintiffs, promised that, if the future deliveries of coal were satisfactory, plaintiffs would continue to handle the coal for the defendant company in New York market, and would extend to the defendant company the same accommodations, financial and otherwise, that they had extended to the old company"; the defendant company, before making any new requests to the plaintiffs for financial accommodations, delivered coal to plaintiffs on account of the old debt to the amount of $15,338.38; that after this coal was delivered, "in further pursuance of said agreement, plaintiffs gave to the defendant company on June 19, 1895, their acceptance of a draft for $5,000, the proceeds of which defendant used in its business, and from thereafter and until the latter part of April, 1897, the parties continued business dealings, the plaintiffs advancing cash, and accepting defendant's drafts, as against which the defendant company made deliveries of coal to plaintiffs from time to time"; that "at the termination of the business dealings between the parties in the latter part of April, 1897, the amount of cash advanced by the plaintiffs

to defendant, and the amount of said acceptance given as aforesaid, together with the sundry items of the account in favor of plaintiffs, exceeded the amounts of deliveries of coal by the sum of $7,616.53"; that upon the trial the parties stipulated that:

"If the court should hold that there was a lawful assumption of the defendant company of the old company's indebtedness to plaintiff, then plaintiff should have judgment for $5,472.88, and that, if such question were determined in favor of defendant company, then that it should have judgment for $15,321."

As a conclusion of law, the court held that the agreement "made by said Nathaniel Taylor and the said Blaisdell was a valid and lawful agreement, and was binding upon the defendant company."

It thus appears that the plaintiffs made no advances to the new company; its payment to the new company never equaled the amount of coal that it had actually delivered to the plaintiffs prior to any advances that they made; and the defendant's liability depends entirely upon the validity of this agreement, made by the president of the defendant corporation without authority from its directors or stockholders, to assume an indebtedness of the old company for which the defendant was not liable. I do not think that the president of the defendant had any authority to make a contract by which the defendant assumed an indebtedness of the old company. It is undoubtedly true that executive officers of trading corporations have implied authority to make contracts in relation to the business that the corporation is carrying on; and, if the contract sued on had been one merely to obtain advances of money or credit to be used in the ordinary business transactions of the defendant, it may be that the president would have had authority, under the general power vested in the executive officers of such corporations, to make such a contract; but this defendant was in no sense responsible for the debts of the Penn Anthracite Company. Its assumption of the debts of that corporation could only be justified by a consideration moving to the new company. It was not a contract made in the ordinary business of the corporation, which consisted of handling and selling coal. It asked and obtained from the plaintiffs no advances to enable it to transact its business, and the result of this plaintiffs' transactions with the defendant was the receipt by them of over $15,000 more than they paid to the defendant. This making of the contract was not communicated to the directors, and it was not authorized or ratified by them. The by-laws of the corporation provide:

"No debt or liability beyond that incurred in the ordinary business transactions of the company shall be contracted by any officer of the company without the consent of a majority of all the directors."

Such a consent was never obtained. Nor do the by-laws give to the president power to make such a contract as that sought to be enforced in this action. The minute book of the corporation was put in evidence, and there is no statement as to any communication of this contract by the president to the directors, or ratification by the directors of his act in making such a contract. The directors testified that they never consented to the assumption by defendant of any indebtedness, lien, or obligation of the Penn Coal Company; nor did

the corporation afterwards, with their knowledge, assume any debt or obligation of the Penn Coal Company. This item of indebtedness never appeared upon the books of the defendant, and there was no competent evidence to show that any director had knowledge that the president of the defendant had assumed to make such an agreement on its behalf, or that the coal consigned to the plaintiffs was consigned by virtue of such an agreement. I do not think that the defendant's president had any authority to impose upon the defendant a liability for the debts of the Penn Company; nor do I think that there was a sufficient consideration to sustain this contract, if the president had power to make it. The contract, as found by the court, was that Taylor, on behalf of the defendant company, promised Blaisdell that if the plaintiffs would continue to handle their coal in the New York market, and to give the defendant company the same financial accommodations and other aid that they had given to the old company, the defendant company would deliver to the plaintiffs sufficient coal to wipe out the old debt by deliveries of coal or otherwise. The consideration for this obligation on behalf of the defendant was that the plaintiffs promised that, if future deliveries of coal were satisfactory, the plaintiffs would continue to handle the coal for the defendant company, and would extend to it the same accommodations that they had extended to the old company. There was no absolute engagement on behalf of the plaintiffs to do anything. It was all conditioned upon future deliveries of the coal being satisfactory to the plaintiffs, and the subsequent delivery of coal to the plaintiffs was not a performance of any obligation assumed by them to sustain such a contract as that sought to be enforced. If the plaintiffs had refused to act for the defendants and receive their coal, there would be no cause of action against the plaintiffs for such a refusal, based upon such a promise. I think, therefore, that the president of the defendant had no authority to make such a contract as is here sought to be enforced, that the contract was not ratified by the board of directors of the corporation, and that there was no sufficient consideration to support the contract.

I think the judgment appealed from should be reversed.

VAN BRUNT, P. J., concurs.