RICHARD H. HIGGINS and Others, Respondents, *v.* THE HOCK-
ING VALLEY RAILWAY COMPANY, Appellant.

First Department, July 3, 1919.

**Negotiable instruments — bonds secured by trust mortgage — effect
on negotiability of reference in bonds to collateral security —
effect on negotiability of provisions in mortgage for acceleration
of due date — title passing by delivery — guaranty of bonds as
affecting negotiability — bona fide purchasers, rights of — estoppel
of guarantor to deny illegality of guaranty — corporations —
guaranty of bonds of another corporation — ultra vires — right
to plead when corporation has received benefits — action upon
guaranty — prima facie case.**

Bonds of a corporation secured by a trust mortgage are negotiable instru-
ments within the meaning of section 20 of the Negotiable Instruments
Law.

The mere fact that in the bonds reference is made to the mortgage or deed
of trust of even date, executed by the corporation to secure said bonds,
for a description of the property and franchises thus mortgaged and the
nature, extent and rights of the holders of the bonds under the same,
and the terms and conditions upon which said bonds were issued, does not
affect their negotiability.

Bonds are payable " at a fixed or determinable future time " within the
meaning of subdivision 3 of section 20 and section 23 of the Negotiable
Instruments Law, although by the terms of the mortgage, upon default of
making payments of interest as and when provided by the bonds, the
holders might accelerate the due day for the payment of the principal
secured, and foreclose the mortgage.

Title to bonds secured by a trust mortgage pass by delivery.

A guaranty agreement indorsed on bonds of a corporation and executed by
a third party whereby such third party guaranteed to the several and
successive holders thereof the payment of the bonds and interest thereon
and said third party's covenant to pay the same upon the demand of the
holders of said bonds and of said guaranty agreement in case of the default
of the obligor, does not render the bonds non-negotiable.

Purchasers of the bonds of a corporation secured by a trust mortgage, in the
due course of business and without any knowledge of the transactions or
agreements culminating in the issuance of said bonds, and before maturity,
are entitled to enforce an agreement of guaranty thereon.

A corporation is estopped to deny the validity of its act in guaranteeing
the bonds of another corporation where it is stated in the agreement that
the guaranty was made " in consideration of the purchase of the within
bond and the sum of One Dollar, The Hocking Valley Railway Company,
the holder thereof, hereby guarantees to the several and successive holders

thereof the due, regular and punctual payment of the principal and interest of the within bond."

A corporation cannot defend an action based on the guaranty of the bonds of another corporation, on the ground that the guaranty was *ultra vires*, where it has received the benefits arising from the sale of the bonds.

In an action by trustees, representing the holders of corporate bonds, upon a contract by defendant guaranteeing payment of said bonds, *held*, that plaintiffs have established a *prima facie* case to the amount recovered as for money had and received.

APPEAL by the defendant, The Hocking Valley Railway Company, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York upon the report of a referee appointed to hear and determine the issues.

*G. H. Dorr* of counsel [*A. C. Rearick* and *A. H. Smith* with him on the brief; *Rearick, Dorr & Travis*, attorneys], for the appellant.

*Winfred T. Denison* of counsel [*Havens Grant* with him on the brief; *Stetson, Jennings & Russell*, attorneys], for the respondents.

*Joseph M. Hartfield, amicus curiæ.*

MERRELL, J.:

This is an appeal by the defendant from a judgment entered on the report of a referee appointed herein to hear, try and determine the issues in the action, in favor of the plaintiffs and against the defendant for $715,975.70, principal and interest. The plaintiffs are trustees representing the holders of 1,127 of the corporate bonds of the Continental Coal Company, a West Virginia corporation. The defendant has been held liable as the guarantor of the bonds of said corporation. The Toledo and Ohio Central Railway Company, another corporation, also guaranteed the payment of said bonds, and in a separate action judgment has been obtained against said last-mentioned railway company upon its guaranty. The corporate bonds of said Continental Coal Company were secured by mortgage upon its corporate property. The mortgage has been foreclosed, the property sold, and from the

First Departmeut, July, 1919.      [Vol. 188.

proceeds thereof the sum of $506.75 per bond has been realized and credited upon said bonds. The judgment appealed from herein is for balance due the bondholders represented by the plaintiffs upon said bonds under such guaranty agreement of the defendant, The Hocking Valley Railway Company. This action is one of five, all of which, under stipulation, were tried together before said referee, and all of which actions involve similar questions of fact and of law. The bonds in question bear date February 1, 1902, were duly executed by the Continental Coal Company, and are in form ordinary first mortgage five per cent coupon gold bonds for $1,000 each. By the terms of these bonds said Continental Coal Company, for value received, promised to pay to the bearer the sum of $1,000 in gold coin of the United States of the present standard of weight and fineness, on the 1st day of February in the year 1952, at its office or agency in the city of New York, and to pay interest thereon from February 1, 1902, at the rate of five per centum per annum until said bonds should be fully paid, said interest to be paid semi-annually at the office of said corporation in like gold coin, on the first day of February and first day of August in each year upon presentation and surrender of the coupons therefor annexed to said bonds. By the terms of said bonds the principal and interest were payable without deduction for taxes or stamp duties under existing or future laws of the United States or any State, county or municipality therein. The bonds in question were each of a series of 3,500 bonds of like tenor executed by said company, the aggregate par value thereof amounting to $3,500,000, and all secured by a first mortgage or deed of trust of even date with said bonds, executed by the corporation to the Standard Trust Company of New York, as trustee, covering the property, real and personal, of the corporation as described in said mortgage. Upon each of said bonds was indorsed the written guaranty of the Toledo and Ohio Central Railway Company, and also the guaranty of the defendant, The Hocking Valley Railway Company, said instruments of guaranty being severally duly executed by the guarantors. The instrument of guaranty thus printed and appearing upon each of the bonds in suit and executed by this defendant was in the following form:

" COLUMBUS, OHIO, *February* 10, 1902.

" In consideration of the purchase of the within bond and of the sum of One Dollar, The Hocking Valley Railway Company, the holder thereof, hereby guarantees to the several and successive holders thereof the due, regular and punctual payment of the principal and interest of the within bond, and covenants itself to pay the same upon demand of the holder hereof in case of non-payment by the obligor when due.

" (Signed) THE HOCKING VALLEY RAILWAY CO.,

" By N. MONSARRAT, *President.*

" Attest: WM. N. COTT,

" *Secretary.*   [Corporate Seal] "

Subsequently to the commencement of this action the New York Central Railroad Company relieved the bondholders represented by the plaintiffs and took over all the bonds involved in this action at par and interest, paying cash therefor and receiving assignments of this and the other causes of action as well as assignments of the judgments heretofore obtained against defendant's coguarantor, the Toledo and Ohio Central Railway Company. Such assignment was made, however, with the understanding that the action should be prosecuted in the name of the parties plaintiff who commenced the same. The real party in interest, therefore, as assignee of the plaintiffs, is the New York Central Railroad Company.

The Continental Coal Company was organized on or about July 1, 1901, under the laws of the State of West Virginia for the purpose of acquiring certain coal lands in southern Ohio situate in the vicinity of the line of the Hocking Valley Railway Company and of the Toledo and Ohio Central Railway Company. These two railroads had their northern terminus at Toledo, O., and ran from thence in a southeasterly direction nearly parallel to the southeastern part of the State. They were rival companies engaged largely in the transportation of coal, some of which came from the Hocking Valley coal fields in southern Ohio and some of which came from the Kanawha coal district in West Virginia. From the latter district the coal was shipped northward over the Kanawha and Michigan Railway Company to the southern terminus

of either the road of the defendant company or by that of the Toledo and Ohio Central Railway Company for transportation to Toledo and from thence for distribution by the Great Lakes to the west and northwest.

In addition to complaining upon the contracts of guaranty indorsed upon the bonds in question, the plaintiffs, in their complaint, allege, as a second cause of action, that at the time of the execution of said guaranties by the defendant and the sale of the bonds, the defendant received from the purchaser of said bonds, for. the use of the purchaser, the said moneys for which judgment was demanded, with interest. The complaint further alleges that default in the payment of the interest was made by the Continental Coal Company in 1915 and 1916. Thereupon a majority of the bondholders declared the principal due under the terms of the bonds, and brought said action to foreclose the mortgage securing the same. The due execution of the bonds in suit is conceded ·by the defendant as well as the execution by defendant of the guaranty agreements thereon. It is also undisputed that the bonds were duly issued and sold and became the property of the plaintiffs and those whom they represent; that in 1915 and 1916 default was made in the payment of two successive coupons attached to each of said bonds; that thereupon a majority of the holders thereof declared the bonds to be due and due demand was made upon the defendant to pay the bonds and interest under its guaranty agreement, and that no part thereof has been paid.

The defendant, answering, asserts, *first*, that the guaranty agreement was illegal, and part of a transaction held by the State courts of the State of Ohio and by the Federal courts to be in violation of the statutes of the State of Ohio, of the Interstate Commerce Act and of the so-called Sherman Anti-trust Act; *second*, that the act of the corporation in executing the guaranty agreements upon which plaintiffs claim was *ultra vires; third*, that the plaintiffs had no cause of action for money had and received; *fourth*, that the plaintiffs had no authority to establish a right of action to recover the principal of the bonds; and, *fifth*, that the judgment of the Ohio court having made it impossible for the defendant to pay the interest upon the bonds, plaintiffs cannot equitably take

advantage of that impossibility to sue the defendant for the principal debt. The two principal defenses thus interposed by the answer of the defendant are the alleged illegality of the contract and the defense of *ultra vires.*

The facts leading up to the issuance of these bonds are, briefly, as follows:

As before stated, the lines of the Hocking Valley Railway Company and of the Toledo and Ohio Central Railway Company substantially parallel each other in the State of Ohio. Both were engaged largely in the transportation of coal. Aside from the coal produced in the State of Ohio the coal shipped over these roads was received from the Kanawha coal district in West Virginia over the line of the Kanawha and Michigan Railway Company, which connected with the termini of the two Ohio railways. Coal received from the Kanawha district and destined for Toledo and points in the west and northwest could be carried over either of said Ohio roads. The Toledo and Ohio Central Railway Company had a controlling interest in the stock of the Kanawha and Michigan Railway Company, and prior to 1901, when the combination hereinafter referred to was formed, most of the coal shipped over the Kanawha and Michigan Railway Company was shipped through Ohio over the Toledo and Ohio Central Railway Company. At that time the latter company and the Kanawha Railway Company were short of rolling stock, and required more cars to ship coal upon their lines. The purchase of 1,500 new coal cars was considered, but the companies were unable to finance such purchase. The Hocking Valley Railway Company had sufficient cars at its disposal in addition to those required upon its own road, and sent a number of cars over the Kanawha railway to be used in the transportation of coal from the Kanawha coal district. Some years prior the defendant company had been reorganized by the banking firm of J. P. Morgan & Co. of New York. A member of that firm was placed upon its board of directors. A majority of the stock of the Toledo and Ohio Central Railway Company had been acquired by the same interests, and in the spring of 1901 the control of the defendant company, of the Toledo and Ohio Central Railway Company and of the Kanawha and

First Department, July, 1919.     [Vol. 188.

Michigan Railway Company was in the same hands. A member of the firm of Morgan & Co., one Steele, was a director in both Ohio railway companies. Early in 1901 representatives of the defendant railway company called upon and conferred with Steele of the Morgan firm as to the desirability of increasing the transportation of coal over the line of the defendant company and of generally improving the methods and facilitating the transportation of coal from the Kanawha district over the road of the Kanawha and Michigan Railway Company and over the lines of the two competing Ohio railway companies. It was suggested that a corporation be formed to acquire by purchase extensive coal lands in the States of Ohio and West Virginia, and that a combination should be made between the two Ohio railway lines for an equal division of transportation of coal destined for Toledo and the northwest. A plan of operation was agreed upon and pursuant thereto a representative of the defendant company visited the Kanawha coal district of West Virginia and obtained extensive options upon coal lands there. These lands were found to be rich in coal deposits and a company known as the Kanawha Coal Company was incorporated to take over and operate said coal field. There was also organized as a part of the same combination the said Continental Coal Company, which for like purpose acquired extensive coal lands in southern Ohio, a portion of which was upon the line of the defendant's railway and a portion upon the line of the Toledo and Ohio Central Railway Company. The Continental Coal Company was organized with an authorized issue of $3,500,000 of stock and the same amount of bonds. These bonds were guaranteed by both of the Ohio railway companies, as before stated. A syndicate was formed by the Morgan banking firm for the sale of the bonds. Money was advanced by Morgan & Co. to finance the enterprise and to pay for the coal land acquired by the Continental Coal Company. The bonds were all disposed of for cash at $102\frac{1}{2}$ and accrued interest. For their services Morgan & Co. received $500,000 of the stock of said corporation. They also received a commission of one per cent for their services in forming the syndicate and in disposing of the bonds. The remaining one and one-half per cent premium received upon the sale of the

bonds was distributed among the members of the syndicate. The balance of $3,000,000 of capital stock was likewise distributed among the members of the syndicate in proportion to their contributions. The amount received from the sale of said bonds was turned over to the coal company, less the commission to Morgan & Co. and less the premium of one and one-half per cent distributed among the members of the syndicate. It is claimed by the defendant that the combination was formed in the interest of Morgan & Co. and not in defendant's interest. The evidence fails to bear out that contention. The officers of the railroads involved were apparently acting in absolute good faith and in an earnest effort and belief that the profits of their roads would be increased in tonnage of coal shipped thereon as the result of the combination. The profit actually received by Morgan & Co. was quite inconsequential. The one per cent which they received for their services in forming the syndicate and in disposing of the bonds was certainly not an excessive return for the labor involved, and appears to have been the usual commission paid for such service. The $500,000 of the capital stock in reality represented nothing and was without actual value, nor does it appear that such stock ever became of substantial value. The holders thereof were legally liable for the debts of the corporation, and were liable to assessment therefor upon their unpaid stock. If eventually the business of the Continental Coal Company should prosper, there would, of course, be a profit to the holders of the stock. The company was doing business entirely upon borrowed capital. If the enterprise was eventually successful there would, of course, be a return to the shareholders of the stock to the extent of any gain by the corporation over interest upon its obligations and over whatever might be required as a contribution to the sinking fund to take care of its bonds. In any event, the defendant company stood to profit by the increased transportation of coal over its lines.

Two years after the formation of this combination and the flotation of said bonds, quo warranto proceedings were taken by the State of Ohio to set aside such combination. Therein judgment was rendered that the contract between the defendant company, the Toledo and Ohio Central Railway

First Department, July, 1919.    [Vol. 188.

Company, and the Continental Coal Company, which, among other things, provided for an equal division of coal shipments and the guaranty of the bonds of the Continental Coal Company by said railways, was illegal under the laws of Ohio as tending to stifle competition. It was held that the combination between said Ohio railway companies was illegal, and that the defendant company illegally held a majority of the stock of the Kanawha and Michigan Railway Company, and the defendant company was excluded from holding said stock and from continuing to control the business of said coal companies. It was by said judgment decreed that the defendant company should be ousted from exercising the power of guaranteeing the bonds of the Continental Coal Company or voluntarily paying, securing or otherwise admitting any liability on said bonds or any of them, and should be ousted from carrying out the contracts for a division of freight between it and the Toledo and Ohio Central Railway Company. Thereafter and in 1911 suit was brought by the United States against the defendant company, the Toledo and Ohio Central Railway Company, the Kanawha and Michigan Railway Company, and the several coal companies organized as a part of said combination, to set the same aside upon the allegation that the arrangement into which said companies had entered was in violation of the so-called Sherman Act. In March, 1914, a decree was entered in said action brought by the United States against said companies holding that said combination was illegal and in violation of said Sherman Act. However, in each of those actions, both in the quo warranto proceedings brought by the State of Ohio and in the action brought by the United States under the Sherman Act, the courts expressly refused to pass upon the question as to whether or not the defendant company or its coguarantor, Toledo and Ohio Central Railway Company, was liable under its contracts of guaranty to the holders of said bonds. It was held, and the courts recognized, that in the absence of the holders of said bonds as parties litigant in said proceeding and in said action, the court was without jurisdiction to determine the validity of the claims of said bondholders under such guaranty agreements. It is quite apparent that the conclusion reached in those actions

that the guaranties were illegal was because they were a part of the general scheme which violated the Sherman Act and the statutes of the State of Ohio. In the quo warranto proceedings taken by the State of Ohio, upon the authority of *Lough* v. *Outerbridge* (143 N. Y. 271); *Interstate Commerce Commission* v. *Chicago G. W. Railway* (209 U. S. 108) and other cases cited, it was held that tonnage contracts as such and without other features were entirely legal and should be upheld. As was said in the Ohio case (*State ex rel. Attorney-General* v. *Hocking Valley Railway Co.*, 12 Ohio Cir. [N. S.] 49, 145, 148): " Tonnage contracts, as such and without other features, have been generally, if not universally upheld." (Citing cases.)

It was held, however, in the Ohio case that the contracts in question were more than mere tonnage contracts and were, in fact, unlawful combinations tending to stifle competition and were illegal under the laws of that State. In the opinion of the Ohio court, among other things, it was further said (p. 150): " The court agrees with counsel that it has no jurisdiction to determine in this action the rights of the bondholders. The suggestion in the original opinion as to the validity of the bonds as against the property of the railway company was employed in an effort to distinguish the decision by LURTON, J., in the *Hocking Valley* case [*Central Trust Co.* v. *Columbus, H. V. & T. Ry. Co.*], reported in 87 Fed. 815, from the case at bar. It is clear to the court that the rights of the bondholders can only be determined when an appropriate suit is brought, wherein they are made parties. Whether, therefore, the bondholders can exact of the railway company the full amount with interest to maturity, or whether the vice of *ultra vires* affects the validity of the bond, is not now for decision. But as against the railway company, the State has the right to call upon the defendant, as an alternative to save its charter, that it purge itself of the illegal act."

In so far as the validity of the guaranty agreement was questioned, it was upon the fact that it formed a part of the general monopolistic agreement violative of the Ohio statutes. All that the decisions of the United States District Court and the State court of Ohio held was that the agreements entered into between the defendant and the other companies created

First Department, July, 1919.          [Vol. 188.

a monopoly and violated the provisions of the Sherman Act and the Ohio statutes in that they restricted competition. It is true that the Ohio court held that the guaranty agreements, being a part and parcel of such unlawful combination, were, as between the United States and the State and said defendants, illegal. And while it is true that the courts have held, I think, very properly, that under the circumstances under which this combination was formed, it was in violation of law, its objectionable features were quite unknown to the purchasers of the bonds in suit. They had no notice that a contract into which the defendant might with propriety enter was, in fact, a part of a monopolistic scheme which rendered the whole transaction, including the guaranty of the bonds, void. And as to whether or not the innocent holders of such bonds can enforce the agreement of the defendant to guarantee the payment thereof presents quite a different question. These bonds were purchased and paid for in good American money by the persons to whom the bonds were delivered. They purchased for full value, without notice of any defense thereto. The purchasers were entirely ignorant of the circumstances under which said bonds were issued. All they knew or saw was that they were ordinary coupon bonds, payable in gold, with interest at five per cent, were issued under the supervision of J. P. Morgan & Co., a well-known and reliable banking firm, and, besides the obligation of the corporation issuing them, and beyond the security afforded by the mortgage upon the property, real and personal, of said corporation, that they bore upon their backs the duly executed guaranty of payment by the defendant, The Hocking Valley Railway Company, and of its coguarantor, the Toledo and Ohio Central Railway Company. These bonds were, I think, clearly negotiable instruments within the provisions of the Negotiable Instruments Law of this State (Consol. Laws, chap. 38; Laws of 1909, chap. 43), and that the purchasers are protected by the provisions of said law as innocent purchasers for value before maturity. That law provides, by section 20, as follows:

" § 20. Form of negotiable instrument. An instrument to be negotiable must conform to the following requirements:

" 1. It must be in writing and signed by the maker or drawer;

" 2. Must contain an unconditional promise or order to pay a sum certain in money;

" 3. Must be payable on demand, or at a fixed or determinable future time;

" 4. Must be payable to order or to bearer; and

" 5. Where the instrument is addressed to a drawee, he must be named or otherwise indicated therein with reasonable certainty."

These bonds answer every requirement thus prescribed by the Negotiable Instruments Law. They were in writing, signed by the Continental Coal Company; each contained an unconditional promise to pay the sum of $1,000 and interest at five per cent in gold; they were made payable on the 1st day of February, 1952; they were payable to bearer. Every requirement of the statute was, therefore, met. (*Louisville, etc., R. Co.* v. *Louisville Trust Co.*, 174 U. S. 552; *Hibbs* v. *Brown*, 112 App. Div. 214; affd., 190 N. Y. 167.) In *Hibbs* v. *Brown* (*supra*) the negotiability of bonds was upheld, notwithstanding that the bonds referred to the deed of trust given as collateral security for their payment, for the terms and conditions upon which said bonds were issued and secured. The mere fact that in these bonds of the Continental Coal Company reference is made to the mortgage or deed of trust of even date, executed by said coal company to secure said bonds, for a description of the property and franchises thus mortgaged and the nature and extent and the rights of the holders of the bonds under the same, and the terms and conditions upon which said bonds were issued, does not, I apprehend, affect their negotiability. The bond themselves were the principal security, and the mortgage or deed of trust was given only as collateral security for their payment. It is true that under the terms of the mortgage, upon default in making payments of interest as and when provided by the bonds, the holders might, as they in fact did, accelerate the due day for the payment of the principal secured and foreclose the mortgage. The bonds, by their terms, were payable " at a fixed or determinable future time." The phrase of subdivision 3 of section 20 of the Negotiable Instruments Law thus quoted is by section 23 of the same law defined as " on or before a fixed or determinable future time specified therein."

Therefore, the due acceleration of the due date by the bond-holders only served to make the principal due at a date *before* that on which it would have come due except for the default in payment of interest by the obligor. Even with the due date thus accelerated, the bonds still remained payable "at a fixed or determinable future time," as defined by section 23 of the Negotiable Instruments Law. Title to these bonds passed by delivery. The guaranty agreement indorsed thereon and executed by the defendant, whereby the defendant guaranteed to the several and successive holders thereof the due, regular and punctual payment of the bonds and interest thereon and defendant's covenant to pay the same upon demand of the holder of said bond and of said guaranty agreement, in case of the default of the obligor, in nowise detracted from the negotiability of the instrument. (*Everson v. Gere,* 122 N. Y. 290; *Connecticut M. L. I. Co.* v. *Cleveland, etc., R. R. Co.,* 41 Barb. 9; *Ketchell* v. *Burns,* 24 Wend. 456; *Clokey* v. *Evansville & T. H. R. R. Co.,* 16 App. Div. 304; *Chicago R. Co.* v. *Merchants' Bank,* 136 U. S. 268; *Dickerman* v. *Northern Trust Co.,* 176 id. 181; *Union Loan & Trust Co.* v. *Southern California Motor Road Co.,* 51 Fed. Rep. 840.) Therefore, the purchasers of these bonds were innocent purchasers for value before maturity and without notice of any defense thereto. As such *bona fide* holders they are entitled to enforce the agreements of guaranty thereon.

Moreover, it seems to me that, having executed the guaranty agreement, the defendant is estopped from claiming the illegality thereof. The guaranty agreement bears date July 20, 1901, and was evidently drawn with a view of creating an estoppel on the part of said defendant from thereafter disclaiming legal liability upon said guaranty agreement. It was stated in the agreement that the guaranty was made "in consideration of the purchase of the within bond and the sum of One Dollar, The Hocking Valley Railway Company, the holder thereof, hereby guarantees to the several and successive holders thereof the due, regular and punctual payment of the principal and interest of the within bond," etc. Thereby the defendant represented that it had purchased and owned the bond which it was guaranteeing "to the several and successive holders thereof." The intention was manifest that .

the form of guaranty was prepared with a view of estopping the guarantor from later denying the validity of its act.    Upon its face and so far as the innocent purchasers of the bonds had any notice or information, the contract was one which the defendant company could make.    The defendant company had, so far as the purchasers knew, a right to acquire the bonds of the Continental Coal Company, and having acquired the same had the right to sell and dispose of said bonds and to guarantee the payment thereof to succeeding purchasers or holders.    Therefore, both upon the doctrine of estoppel and because the plaintiffs and those they represent are innocent holders thereof for value, said bonds being negotiable paper, the defendant is liable on its contract of guaranty.

Likewise, as to the defense of *ultra vires*, it seems to me that the defendant is estopped from urging the same.    The defendant company received all the benefits from these bonds. It received full pay from the purchasers thereof and should not now be permitted to plead *ultra vires*.    The law is well settled that where a corporation has received the consideration for a contract which the corporation was, in fact, powerless to make, it is estopped from pleading its lack of power to execute the contract.    (*Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Kent* v. *Quicksilver Mining Co.*, 78 id. 159.)    As was said by ALLEN, J., in *Whitney Arms Co.* v. *Barlow* (*supra*, 69, 70): " It is now very well settled that a corporation cannot avail itself of the defense of *ultra vires* when the contract has been, in good faith, fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract."

" The plea of *ultra vires* should not as a general rule prevail, whether interposed for or against a corporation, when it would not advance justice, but on the contrary would accomplish a legal wrong."

Referring to an attempt to retain benefits received from a contract which a party seeks to repudiate as *ultra vires,* Judge FINCH said in *Seymour* v. *Spring Forest Cemetery Association* (144 N. Y. 333, 341): " That kind of plunder which holds on to the property but pleads the doctrine of *ultra vires* against the obligation to pay for it, has no recognition or support in the law of this State."

And as was said by Chief Judge RUGER in *Woodruff* v. *Erie Railway Company* (93 N. Y. 609, 619): "It is now very well settled that a corporation cannot avail itself of the defense of *ultra vires* where the contract has been in good faith fully performed by the other party, and the corporation has had the full benefit of the performance and the contract." (See, also, *Curtis* v. *Natalie Anthracite Coal Co.*, 89 App. Div. 61; affd., 181 N. Y. 543; *Bowers* v. *Ocean Accident & Guarantee Corp., Ltd.*, 110 App. Div. 691; affd., 187 N. Y. 561; *McVity* v. *Albro Co.*, 90 App. Div. 109; affd., 180 N. Y. 554; *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 60.)

The defendant company, as the result of the arrangement, and upon its guaranty, was able to float said bonds, all of which were in the first instance held by the defendant. Upon its guaranty it was able to dispose of said bonds and to obtain good money therefor from the purchasers. Moreover, it has received the benefit which it expected to receive, to wit, the profits arising from the additional coal transported over its lines. While there is a dispute in the testimony as to the amount of profit, it is apparent that the defendant company has materially profited by the arrangement.

It, furthermore, seems to me that the plaintiffs have made out a *prima facie* case against the defendant to the amount recovered as for money had and received. The contract of guaranty was between the defendant company and the holders of the bonds in suit, and was a direct contract with said bondholders. By said agreement it covenanted to pay upon demand to the holder of each bond the amount thereof in case of non-payment by the obligor when due.

Under such circumstances, and upon every consideration of justice and fair dealing, it seems to me, the defendant should be held upon its contract of guaranty, and that the learned referee properly disposed of the issues herein.

The judgment appealed from should be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, DOWLING and PAGE, JJ., concurred.

Judgment affirmed, with costs.