JAMES F. T. O'CONNOR, as Comptroller of the Currency, and Others, Plaintiffs, *v.* BANKERS TRUST COMPANY and Others, Defendants.

Supreme Court, Special Term, New York County, June 29, 1936.

*Alfred A. Cook* and *Clarence J. Shearn* [*Clarence J. Shearn, Alfred A. Cook. Ben Herzberg, Henry Cohen, Clarence J. Shearn, Jr.,* of counsel], for the plaintiffs James F. T. O'Connor, as Comptroller of the Currency, and Frederick V. Goess, as receiver of the Harriman National Bank and Trust Company of City of New York.

*Harold Nathan,* for the plaintiff Henry E. Cooper.

*Davis, Polk, Wardwell, Gardiner & Reed* for the defendant Guaranty Trust Company of New York. *John W. Davis, Joseph M. Proskauer* and *Bethuel M. Webster, Jr.,* of counsel, for all the defendants except The Manhattan Company.

*Root, Clark & Buckner* [*Wilkie Bushby* and *Herman T. Stichman* of counsel], for the defendant President and Directors of the Manhattan Company.

*White & Case* [*J. DuPratt White, Joseph M. Hartfield* and *Roy H. Callahan* of counsel], for the defendant Bankers Trust Company.

*Joseph V. McKee,* for the defendant Title Guarantee and Trust Company.

*Shearman & Sterling* [*Philip A. Carroll* and *Robert N. West* of counsel], for the defendant Chemical Bank and Trust Company.

*Wise, Shepard & Houghton* [*Woolsey A. Shepard* of counsel], for the defendant The Continental Bank and Trust Company of New York.

*Leon Schaeffler,* for the defendant The Fifth Avenue Bank of New York.

*Curtis, Fosdick & Belknap* [*James F. Curtis* of counsel], for the defendant The First National Bank of City of New York.

*Moses & Singer* [*S. L. Cohen* of counsel], for the defendant The Public National Bank of New York.

*Kobbe, Thatcher, Frederick & Hoar* [*J. M. P. Thatcher* and *Karl T. Frederick* of counsel], for the defendant Percy H. Johnston.

*Edwin F. Blair,* for the defendant William C. Potter.

SHIENTAG, J.   This action is brought by the present Comptroller of the Currency, the receiver of the Harriman National Bank and Trust Company of the City of New York, and Henry E. Cooper, its president, on behalf of the depositors of that institution.

Two causes of action are stated, one against the member banks of the New York Clearing House Association and a second in the alternative against the individuals who, during 1932 and 1933, composed the executive body of the association known as the clearing house committee.

The action against the defendant banks is to enforce the performance of an agreement alleged to have been made by the clearing house committee, on behalf of the banks, with John W. Pole, the Comptroller of the Currency, and with Henry E. Cooper, to protect the depositors of the Harriman Bank and prevent its failure. The agreement, it is alleged, was made with Cooper in July, 1932, at the time he accepted, at the suggestion of the clearing house committee, the presidency of this unsound member bank, and with the Comptroller, in order to induce him to refrain from closing the bank, and to allow the clearing house committee to look after its affairs. These contracts, it is claimed, were repudiated by the defendant banks during the bank holiday, and the Comptroller thereupon refused to permit the Harriman Bank to reopen at the end of that period. As a consequence, the bank went into forced liquidation and a conservator, and subsequently a receiver, of its assets were appointed.

The second and alternative action is asserted against the individual members of the committee, and charges that if the committee did not have the authority represented, the individual members are liable for breach of warranty of authority.

When this action was commenced there were twenty banks and seven individuals named as defendants. Eleven of the banks have since discharged the obligations asserted against them and paid $3,592,943, for distribution to the depositors. This was based upon an estimated deficit of $6,331,000. The action was discontinued against these banks and against five of the individual defendants, who had been members of the clearing house committee and who were executive officers of the banks which settled. There remain in the action nine banks and two individuals. The sum sought to be recovered against the remaining defendant banks is a total of $2,842,616.45, including interest, to be prorated among the banks in accordance with a formula which will hereafter be discussed. This amount is based upon a revised estimated deficit of $4,862,801.70.

It will clarify the situation to point out that the twenty banks originally sued may be divided into four classes: (a) Six banks whose executive officers were members of the clearing house committee in office in 1932, when the alleged commitments were made. These banks have paid the claims asserted against them, amounting to a total of $2,966,174;[1] (b) two banks, not represented on the

[1] The Chase National Bank of the City of New York (Charles S. McCain, chairman board of directors); Irving Trust Company (Harry E. Ward, president); Central Hanover Bank and Trust Company (George W. Davison, president); Commercial National Bank and Trust Company of New York (Herbert P. Howell,

clearing house committee in office when the alleged commitments were made but whose executive officers, who had been consulted, became members of the clearing house committee which took office in October, 1932. These banks disclaimed liability and their presidents are the remaining individual defendants. The total amount for which these banks are sued is $1,420,333.19;[2] (c) four banks whose executive officers, it is claimed, were consulted about the alleged commitments, but who were not represented on either clearing house committee. Three of these banks have disclaimed liability and are being sued for a total of $1,175,268.81.[3] One has paid its *pro rata* share, amounting to $177,268;[4] (d) eight banks not represented on the clearing house committees, and who were not consulted about the alleged commitments. Of these four have paid a total of $449,501[5] and four, having disclaimed liability, are being sued for a total of $247,014.45.[6]

The Harriman Bank was one of a group of twenty-one banks which were members of the New York Clearing House Association. The clearing house committee of that association received, at regular intervals, reports of the financial condition and the operations of member banks. As early as October, 1931, the committee was concerned about the condition of the Harriman Bank. J. W. Harriman, its president, was sent for and the matter discussed with him. Monthly reports concerning the condition of the Harriman were thereafter received by the committee. The bank's condition became progressively worse. The situation came to a head in May, 1932, when Hanna, the clearing house examiner, presented his report to McCain, as chairman of the clearing house committee, showing that the Harriman Bank was in bad financial condition and that its capital, surplus and undivided profits, shown on the books to be $4,468,000, were probably wiped out.

The committee decided that it would be inadvisable to expel the Harriman Bank from the association, a step which would have forced its immediate closing. They determined to insist on Harri-

president); The National City Bank of New York (Gordon S. Rentschler, president); The New York Trust Company (Mortimer N. Buckner, chairman board of trustees; *ex officio* member of the committee).

[2] Chemical Bank and Trust Company (Percy H. Johnston, president); Guaranty Trust Company of New York (William C. Potter, president).

[3] Bankers Trust Company (S. Sloan Colt, president); The First National Bank of the City of New York (Jackson E. Reynolds, president); President and Directors of the Manhattan Company (J. Stewart Baker, president).

[4] Corn Exchange Bank Trust Company (Walter E. Frew, chairman).

[5] Bank of New York and Trust Company; Manufacturers Trust Company; The Marine Midland Trust Company of New York; Lawyers Trust Company.

[6] The Continental Bank and Trust Company of New York; The Fifth Avenue Bank of New York; Title Guarantee and Trust Company; The Public National Bank and Trust Company of New York.

man's withdrawal from active management of the bank and on the election of a new president to be selected by the committee, to take hold of the bank and endeavor to rehabilitate it.

Thereafter officers of the larger banking institutions who were members of the association but who were not represented on the clearing house committee, were consulted about the program of the committee and, it is alleged, agreed or assented thereto. There is a conflict in the testimony as to whether anything was said to these officers which would indicate that it was proposed that the member banks would guarantee the deposits of the Harriman bank or stand behind the deposits and not allow the bank to fail. This will be discussed more fully later.

In June, 1932, Roberts, Chief National Bank Examiner, of the Second Federal Reserve District, directed Francis, a subordinate, to make an examination of the Harriman. This disclosed marked irregularities in the management and operation of the bank. On receipt of the examiner's report, Roberts, on June twenty-seventh, communicated with McCain, informing him of the substance thereof. McCain stated that he would arrange immediately to have Hanna join Examiner Francis in making a more detailed examination. About a week or ten days later Roberts had a conference with McCain. In the course of these two conversations McCain, it is alleged, assured Roberts that the clearing house would not permit the Harriman Bank to close and would provide funds sufficient to pay all of its depositors if necessary. Roberts communicated the substance of these conversations to his superior, Pole, the Comptroller, who, in reliance on the assurances, refrained from closing the bank.

Thereafter Cooper was asked by McCain and the members of the clearing house committee to take over the presidency of the bank and was assured that they would " stand behind him one hundred per cent." It is alleged that McCain promised Cooper that the banks would guarantee the deposits of the Harriman and protect the depositors. Relying thereon, Cooper assumed the presidency of the bank, and thereafter reported regularly to the clearing house committee on the condition of the Harriman.

On August 11, 1932, Deputy Comptroller Proctor addressed a communication to the board of directors of the Harriman Bank calling attention to a report of an examination of the bank completed on July ninth, showing estimated losses totaling over $7,500,000 and requesting that " in view of the foregoing figures definite steps should be taken to effect a material strengthening of the bank or restore it to an acceptable status in some other satisfactory manner." The letter reached Cooper, who took it up with

McCain with a view to securing its withdrawal. McCain, with the authority of the clearing house committee, called the Comptroller, discussed the situation with him, urged that the letter be withdrawn, and assured him that the banks would stand behind the Harriman deposits. In this conversation, as in previous ones with Roberts and Cooper, McCain referred to the fact that a number of other banks not represented on the clearing house committee had been consulted and would stand behind the assurances given. The Comptroller replied that, relying on McCain's statements, he would be glad to have the letter withdrawn, and asked McCain to put in writing what he had stated.

On August 24, 1932, McCain wrote to Comptroller Pole returning Proctor's letter, asking that it be withdrawn for the reason, among others, that the clearing house committee," which is actively superintending this institution and which expects to look after it, does not want a letter of this character sent to the Directors nor does it want to put Mr. Cooper in the position of suppressing such a letter, if it has been written. * * * As you have nothing to fear from the payment of the depositors, we feel that they are entitled to your full co-operation in working this matter out." This letter was acknowledged by Pole, who stated that upon the assurances expressed therein, his full co-operation might be relied upon.

On February 1, 1933, Acting Comptroller Awalt addressed a communication to Davison, the chairman of the clearing house committee, which had assumed office in October, 1932, reviewing the entire situation and concluding, " I will appreciate a letter from you advising me as much in detail as you deem warranted just how the Clearing House or other financial interests in New York intend to take care of this situation." On February 2, 1933, Davison wrote to the Acting Comptroller and stated, " Mr. McCain's letter covers the attitude and action of the Clearing House Committee." He advised Awalt that Cooper had made distinct progress and closed by saying, " We are very conscious of the situation and are hoping and have some confidence that the improvement will continue and that no gain will be made by precipitancy at this time."

The defendants Johnston and Potter, two of the executive officers who had been consulted by McCain, became members of the clearing house committee in October, 1932.

At a meeting of the committee on February 27, 1933, at which Johnston and Potter were present, Davison read his letter of February second. There is a conflict in the testimony as to what took place at this meeting. After the meeting Johnston and Potter

learned for the first time of the contents of the Proctor and McCain letters of August 11 and August 24, 1932. The other executive officers who had been consulted by McCain were never informed about these letters and did not learn of them until the bank holiday. On March 4, 1933, the bank holiday was declared. The clearing house banks then considered the course to be pursued in connection with the Harriman. Some of the banks disclaimed having entered into any obligation at all concerning the Harriman deposits. The Federal Reserve Bank had sent word that the Harriman would not be allowed to reopen unless it was supplied with new capital amounting to about $6,331,000. A committee was appointed to look into the matter. It was finally decided to send Johnston to Washington, to see the Acting Comptroller and advise him that the clearing house banks would not put up the money. There is a conflict in the testimony as to whether Johnston was asked to attempt to compromise with the Comptroller.

Johnston saw Awalt on Sunday, March 12, 1933, the day before the banks of the country were to reopen, and told him of the situation that had developed; that the clearing house banks believed that the Harriman should not be permitted to reopen and that some of the banks disclaimed liability for the Harriman deposits. The Harriman Bank never opened its doors thereafter.

Various resolutions adopted by the governing boards of some of the defendant banks in relation to this matter, after the declaration of the bank holiday, will be considered later in the opinion, when the subject of ratification is discussed. So far as appears from the testimony, the Harriman situation was not brought to the attention of the board of directors of any member bank until the bank holiday. Secrecy was desired, it is alleged, in order that the object sought to be accomplished would not be frustrated. That was a reason assigned for the refusal to put the alleged guaranty in writing when requested by Pole and by Cooper.

A clear picture of the issues involved will be presented if the defendants' contentions are summarized briefly. The defendants contend: (a) That McCain's conversations with Roberts, Pole and Cooper, and his correspondence with Pole, did not create a contractual liability; (b) that the clearing house committee or McCain, its chairman, as such, had no power to bind the member banks not represented on the committee; (c) that no executive officer of any defendant bank, on its behalf, authorized or empowered McCain or the clearing house committee to make the contract claimed, or had notice that McCain or the committee had assumed any such authority; (d) that an executive officer of a bank had no authority to contract on behalf of his institution to guarantee

the deposits of the Harriman Bank without the approval of his board of directors; (e) that the unauthorized contract, if made, was not ratified by the present corporate defendants; (f) that there was no breach of warranty of authority by the present individual defendants Johnston and Potter.

In addition the defendants set up the following separate defenses: (1) The action is premature. (2) Mutual mistake concerning the actual condition of the Harriman at the time the contract in suit was alleged to have been made. (3) Failure of consideration. (4) Illegality of consideration. (5) The contract sued on is void under the Statute of Frauds. (6) The alleged contract was *ultra vires* and the corporate defendants had no power to make it.

A study of the record convinces me that the plaintiffs have failed to establish the causes of action alleged in the complaint. The importance of the case, the many questions of law which have been raised and ably presented in the briefs of counsel, the necessity of passing on proposed findings of fact and conclusions of law which will be presented by both sides, make it advisable to depart from the usual procedure and to indicate the court's disposition of the special defenses before taking up the main issue.

1. The action is not premature. The defendants plead that, in any event, their liability will not accrue until the Harriman Bank is entirely liquidated and the loss to the depositors exactly fixed. The amount of the loss not yet having been definitely ascertained, they contend that no action may now be brought. But the promise alleged was not to pay the depositors in the event they could not collect from the Harriman Bank by legal proceedings. The promise was to the effect that the bank would not be allowed to fail, that the depositors would not suffer at all. The purpose of the promise was very evident — to solve the problem of the Harriman Bank's insolvency by adding to its assets the pledge of support.

The defendants' liability accrued immediately on default and the depositors did not have to wait to sue until the exact determination of the amount of loss. (*McMurray* v. *Noyes*, 72 N. Y. 523; *Brown* v. *Curtiss*, 2 id. 225, 228; *Garren* v. *Youngblood*, 207 N. C. 86; 176 S. E. 252; Arnold, Outlines of Suretyship and Guaranty [1927], § 23.) No possible harm, in any event, could come to the defendants. Some loss to depositors there will be. The powers of a court of equity are broad enough to frame a decree that will subrogate the defendants, if the judgment should go against them, to the rights of the depositors of the bank, and that will otherwise adequately safeguard the rights of the parties.

2. The defense of mutual mistake concerning the actual condition of the Harriman Bank at the time the contract in suit was alleged to have been made is without foundation in fact or in law. (*Hurd* v. *Kelly*, 78 N. Y. 588, 597.)

3. There was neither want nor failure of consideration for the promises alleged to have been made by or on behalf of the defendants.

4. The contract sued upon is not invalid as being based upon an illegal consideration. This contention can have no application to the contract claimed to have been made with Cooper. It is urged, however, that it was illegal for the Comptroller to have refrained from closing an insolvent national bank, notwithstanding the promise to protect the deposits alleged to have been made to him on behalf of the defendants. The Comptroller acted within his legal powers in refraining from closing the bank. The statute governing the duties of the Comptroller of the Currency provides:

" General grounds for appointment of receiver. Whenever any national banking association shall be dissolved, * * * or whenever the comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, in either case, appoint a receiver who shall proceed to close up such association." (U. S. Code, tit. 12, § 191.)

The defendants argue that the permissive " may " must be construed to be mandatory, under the rule that a statute giving power to public officers in language permissive in form must be considered peremptory where the public interests or the rights of individuals require the exercise of the power. (*Supervisors* v. *United States*, 71 U. S. 435.) Although that rule of statutory construction is a general one, it is not inflexible. (*People ex rel. Doscher* v. *Sisson*, 222 N. Y. 387, 395.) It is to be applied only where an examination of the statute and its purpose indicates clearly a legislative intent to have the mandatory form applied.

The Supreme Court of the United States, in considering the Comptroller's powers under the statute, said: " The provision of the State statute is express that it is the duty of the officers of the bank, when they know it is insolvent, to at once suspend its active operations * * *. Whether a bank is or is not actually insolvent may be, often, a question hard to answer. There may be good reason to believe that, though temporarily embarrassed, the bank's affairs may take a fortunate turn. Some of the assets that cannot at once be converted into money may be of a character to justify the expectation that, if actual and open insolvency be avoided, they may be ultimately collectible, and thus the ruin of the bank and its creditors be prevented. * * * But under

the State statute, no such conservative action can be followed by the officers of the bank except at the risk of the penalties * * *. In such a case the provisions of the Federal statute would permit the Comptroller to withhold closing the bank and to give an opportunity to escape final insolvency. It would seem that such an exercise of discretion on the part of the Comptroller would, in many cases, be better for all concerned than the unyielding course of action prescribed by the State law." (*Easton* v. *Iowa*, 188 U. S. 220, 232.)

It seems clear that no matter what the various States have declared to be their legislative policy in dealing with insolvent State banks, the policy of the Federal statute is to leave to the Comptroller's discretion not only the question of whether a national bank is insolvent, but also whether under the circumstances it is for the best interests of all parties concerned to close an insolvent bank forthwith or to permit it to remain open. (*Washington Nat. Bank of Tacoma* v. *Eckels*, 57 Fed. 870, 872; *United States Nat. Bank of LaGrande* v. *Pole*, 2 Fed. Supp. 153; *Liberty Nat. Bank* v. *McIntosh*, 16 F. [2d] 906.)

Even if the contract be deemed to have contravened the statutory provision, the defense of illegality would be unavailable to the defendants. In the ordinary case it is no doubt the general rule that a cause of action cannot spring from an illegal contract. But the main purpose of the Federal statute is the protection of the depositors of national banks. To permit the interposition of this defense would bring about the very evil the statute was designed to prevent — injury to the depositors.

" If refusal to enforce * * * an illegal bargain would produce a harmful effect on parties for whose protection the law making the bargain illegal exists, enforcement * * * is allowed." (Restatement of the Law of Contracts, § 601.)

The New York courts have applied this doctrine to various situations, and it has been followed in other jurisdictions. (*Pratt* v. *Short*, 79 N. Y. 437, 445, 446; *United States Title Guaranty Co.* v. *Brown*, 166 App. Div. 688; affd., 217 N. Y. 628; *National Bank* v. *Matthews*, 98 U. S. 621; 3 Williston Cont. [1920] § 1632; Anson Cont. [Corbin's ed. 1930] § 271a.) The instant case is one to which its application seems particularly desirable.

Illegality is further urged by reason of the withdrawal of a communication addressed, in August, 1932, by Deputy Comptroller Proctor, to the management of the Harriman Bank calling attention to its unsound condition, and requesting that they advise him of what steps would be taken to remedy it. The request of McCain, then chairman of the clearing house committee, to the

Comptroller to withdraw this letter and the latter's compliance therewith, were improper. The object undoubtedly was to conceal the true condition of the bank from its board of directors. There can be no excuse, even if a contract guaranteeing deposits were made, for deliberately concealing from those charged by law with responsibility for the management of the bank facts concerning which it was their right to be afforded the fullest disclosure. Cooper's fear that the directors would resign were the communication laid before them does not condone the vice inherent in the concealment. The withdrawal of the Proctor letter was, however, merely incidental to the general arrangement claimed to have been entered into. It does not have the effect of casting the blight of illegality over the entire transaction. (3 Williston Cont. [1920] § 1752.)

5. The Statute of Frauds is inapplicable. The defendants claim that the contract sued on is void under the Statute of Frauds as an oral agreement to answer for the debt, default or miscarriage of another. (Pers. Prop. Law, § 31, subd. 2.) The alleged " guaranty," however, was not given to the depositors of the Harriman Bank, who were the creditors; it was given to the Comptroller of the Currency, a stranger to the debt, and to Cooper, another stranger, or, at most, a representative of the debtor itself. It is clear that unless the guaranty is given to the person to whom the debt is owing it is not within the Statute of Frauds. That statute is held generally to apply only to oral promises made to a person to whom another is answerable. (*Tighe* v. *Morrison*, 116 N. Y. 263; *Block* v. *Greenfield*, 137 Misc. 573; Arant, Handbook of the Law of Suretyship and Guaranty [1931], 88; Restatement of the Law of Contracts, § 180, comment [c].)

6. The last of the special defenses, and one which merits more extended consideration, is that the contracts sued on are *ultra vires*. In other words, it is contended that even if liability were otherwise fully established, there can be no recovery, for it is not within the corporate or statutory powers of the defendants to enter into the contracts in suit; and this notwithstanding the fact that the defendants have received the full benefits contemplated by the alleged agreements.

No statute has been brought to my attention specifically prohibiting a bank from guaranteeing the deposits of another. It is true that the exercise of power not expressly granted to banks is prohibited.

" The measure of their powers is the statutory grant; and powers not conferred by Congress are denied." (*Texas & Pacific R. Co.* v. *Pottorff*, 291 U. S. 245, 253.)

" It is settled that the United States statutes relative to national banks constitute the measure of the authority of such corporations, and that they cannot rightfully exercise any powers except those expressly granted, or which are incidental to carrying on the business for which they are established." (*California Bank* v. *Kennedy*, 167 U. S. 362, 366.)

The same rule applies to State banks. (*Nassau Bank* v. *Jones*, 95 N. Y. 115, 121.)

The Federal and New York statutes do not expressly empower banks to guarantee the deposits of another bank or to pledge or appropriate assets for that purpose or to agree that they will not permit another bank to fail. (U. S. Code, tit. 12, § 24; New York Banking Law, § 106, subd. 1.) In both National and State banking laws, however, it is provided that banks shall have " all such incidental powers as shall be necessary to carry on the business of banking."

The question, therefore, is whether the agreement here claimed comes within the implied or incidental powers of the banks. Is the agreement incidental to the exercise of the express statutory powers? The inquiry whether a certain power is " necessary," and, therefore, conferred by statute, presents in the main a question of fact. To decide what is necessary involves a careful consideration of banking experience and history. No dogmatic rule of law can be laid down applicable to all situations. The matter cannot be decided *a priori*. It is important to lay a factual foundation for the determination. (*Texas & Pacific R. Co.* v. *Pottorff*, 291 U. S. 245, 254.) The realistic approach is the proper one. The best evidence of the necessity of any practice is obviously proof that banks have frequently found it vital to their interests to resort to it. It is for that reason that evidence was received of the past practices of New York banks and of those in other States in dealing with analogous situations. Practice and custom cannot override a rule of law, but they may help to define the scope and to clarify the outlines of such a rule.

Certain broad principles should be kept in mind. A bank may not engage in the guaranty business. Generally it may not guarantee the debt of another, but it " may enter into a contract of guaranty if it is for its own benefit, and not solely for the benefit of the debtor, and is incidental to the banking business." (6 Fletcher Cyc. Corp. [1931] § 2592.) One bank may not ordinarily guarantee the deposits of another, whatever form such undertaking may be made to assume. In the usual course of business, moreover, banks may not band together directly or through an organization, whether a clearing house association or otherwise, for the mutual guaranty

of each other's deposits, with or without limitation. Banks have no such general power. That is a matter of legislative, not of banking policy. (Cf. U. S. Code, tit. 12, § 264.)

The right of self-preservation applies to banks as well as to business corporations and individuals generally. When a crisis arises in which to protect its own depositors and stockholders against loss, a guaranty by one bank of the deposits of another is essential, the law does not withhold that power. It is not necessary that the bank be faced with actual ruin — it is sufficient that danger, real and immediate, of substantial loss to its depositors is present, and that the risk assumed is not out of proportion to the damage threatened, and not out of harmony with the capital structure and the financial condition of the banks involved. In this, as in so many other legal situations, the rule of reason applies. Where those charged with the management of a bank act in good faith and deliberately, with an eye to its own interests and welfare, the exercise of the power here invoked will be upheld.

That there was a banking crisis of a magnitude sufficient to warrant apprehension on the part of the defendants concerning the welfare of their own depositors and stockholders is clear from the record. The situation was characterized by the Comptroller of the Currency as " calamitous." The president of the Guaranty Trust Company in his examination before trial stated that " Conditions were pretty bad. Banks were failing in different parts of the country. Securities were declining in value. The market for bonds was very weak and industrial conditions were bad." At the trial both Buckner and Potter testified that the times were " critical." Johnston, at the trial, sought to minimize the critical aspect of the situation though he did testify that in his report to stockholders he stated, " The year 1932 was the 109th of this bank's history, and one of the most difficult through which it has passed in this long period of time."

Around July, 1932, business was at its lowest ebb. The banking structure was highly sensitive to the marked depression which existed. The Harriman Bank was relatively a small bank to be sure, but the slightest spark may result in a widespread conflagration difficult to control. No bank is immune when confidence is generally disturbed, and particularly when lack of confidence assumes the form of a heedless " run " on another member bank. The danger of heavy withdrawals of deposits forces a bank to provide itself with large amounts of cash; assets must be sacrificed at the very time when prices are lowest. The failure of a single bank may have repercussions which make themselves felt throughout the financial structure. Statistics, however respectable, may

often be deceptive. Subsequent events demonstrated that there was some rational basis at least for the fears that were entertained concerning the effect of a failure of the Harriman Bank on the depositors and stockholders of other clearing house banks. If, in such a situation, action to prevent the failure of a member bank is taken by other member banks in the exercise of fair and honest judgment at the time, for the purpose of preserving the security and integrity of their own institutions, such action, within reasonable limitations, is not an invalid exercise of corporate power.

It is difficult for the human mind to carry itself back in point of time uninfluenced by subsequent events. With the danger past and memory short the defendants now plead that they lacked the power to do what banks throughout the country have often found it necessary to do. They plead that the law has denied them the power to conserve their own imperilled interests. The practice of the clearing house banks in this city to participate in " rescue parties " was clearly established by the evidence. The form such action assumed at various times was different from that taken in this case, but the ultimate object was the same.

In considering whether a contract of the kind here in question is *ultra vires*, no hard and fast rule can be laid down. Each case must be decided on its own particular facts. Under the circumstances of this case I hold that the clearing house banks had power, in a banking crisis in order to avoid loss to their own depositors and stockholders, to make the necessary commitments to keep one of their own members from failing. While the unsecured deposits of the Harriman amounted to $16,530,071.26, any competent banker could estimate within limits relatively narrow the amount of the deficit that would result, and the actual risk taken.

On the precise question of *ultra vires* raised by the defendants, there is no authority in this State or in the Federal courts. Such authority as exists elsewhere is divided. (See in support of plaintiff's contentions, *Southern Exchange Bank* v. *First National Bank of Dublin*, 37 Ga. App. 612; 141 S. E. 323; certiorari denied, 165 Ga. 289; 140 S. E. 753; *Nakdimen* v. *First National Bank*, 177 Ark. 303; 6 S. W. [2d] 505; certiorari denied, 278 U. S. 635. *Contra, Board of Commissioners* v. *Citizens Trust & Savings Bank*, 73 Ind. App. 76; 123 N. E. 130; *Gardiner Trust Co.* v. *Augusta Trust Co.*, 182 A. 685 [Sup. Ct. Me. March 6, 1936].) On the subject generally, see *American Surety Co.* v. *Philippine Nat. Bank* (245 N. Y. 116, distinguishing *Gause* v. *Commonwealth Trust Co.*, 196 id. 134); *Dyer* v. *Broadway Central Bank* (252 id. 430); *Second National Bank* v. *U. S. Fid. & Guar. Co.* (266 Fed. 489); *Norton Grocery Co.* v. *Peoples National Bank* (151 Va. 195; 144 S. E. 501); *Allis-Chalmers*

*Mfg. Co.* v. *Citizens' Bank & Trust Co.* (3 F. [2d] 316, 317); *Gallin* v. *National City Bank* (152 Misc. 679).

The rule obtaining in this State estops such defendants as are State institutions from interposing the plea of *ultra vires* even if otherwise well founded. If the person asserting the defense of *ultra vires* has received the benefits of the contract, he will not be permitted to avoid the contract and at the same time retain the benefits thereof. In New York, which reflects the majority view, the *ultra vires* contract will be enforced in such a case and recovery had directly thereon. Under the minority or Federal rule the *ultra vires* contract is void and unenforcible, but recovery will be permitted on an implied contract to restore the benefits received. (*California Bank* v. *Kennedy*, 167 U. S. 362.) When a national bank is sued in a State court on an *ultra vires* contract, the Federal rule will be applied. (*Appleton* v. *Citizens' Central Nat. Bank*, 190 N. Y. 417.) The benefits received by the defendants were not merely indirect or incidental or negligible. They have had the full benefits of complete performance. In these circumstances the law of this State is clear, that the defense of *ultra vires*, even if it had merit, is not available to those defendant banks which are State institutions. (*Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Vought* v. *Eastern Bldg. & Loan Assn.*, 172 id. 508; *Curtis* v. *Natalie Anthracite Coal Co.*, 89 App. Div. 61; affd., 181 N. Y. 543; *Bowers* v. *Ocean Accident & Guar. Corp.*, 110 App. Div. 691; affd., 187 N. Y. 561; 1 White N. Y. Corp. [1929] 140.)

Having cleared away some of the legal underbrush, I shall now take up the main issue — was there a contract entered into and was it binding on the defendants or any of them?

McCain's conversations with Cooper, his conversations with Roberts, Chief National Bank Examiner, and his conversations with and his letter of August 24, 1932, to Pole, the Comptroller of the Currency, were with contractual intent. They were more than mere promises to enter into some contractual engagement in the future; they were " instinct with an obligation."

Under the agreement Cooper was to assume the presidency of the Harriman Bank and the Comptroller of the Currency was to refrain from taking any action leading to the closing of the bank. In return, it is alleged, McCain, acting on behalf of the defendants, agreed that they would take such steps when and as necessary to prevent the failure of the Harriman Bank and to protect its depositors. These promises had definite meaning to the persons who made and who received them. They were sufficiently precise to form the basis of a contract.

No contract is rejected for indefiniteness whose purpose is so clear. "A contract is void * * * becàuse of uncertainty, only when it is so worded that the intention of the parties cannot be deduced therefrom." (*Ramey Lumber Co.* v. *Schroeder Lumber Co.*, 237 Fed. 39, 44; certiorari denied, 242 U. S. 644.) " Indefiniteness must reach the point where construction becomes futile." "The defendant, then, is bound, unless its promise is to be ignored as meaningless. Rejection on that ground is at best a last resort." (CARDOZO, J., in *Cohen & Sons* v. *Lurie Woolen Co.*, 232 N. Y. 112, 114.)

The amount of the liability assumed was susceptible of ready determination. Agreements to provide the money required to conduct a business, or to furnish what the purchaser requires, have been enforced where the surrounding circumstances indicate the approximate scope of the promise. (*Stern* v. *Premier Shirt Corp.*, 260 N. Y. 201; *Wells* v. *Alexandre*, 130 id. 642; *San Remo Copper Mining Co.* v. *Moneuse*, 149 App. Div. 26; 1 Williston Cont. [1920] § 47; Havighurst and Berman, Requirement and Output Contracts, [1932] 27 Ill. Law Rev. 1, 3.)

The fact that performance could have been accomplished in a number of different ways does not render the agreement so indefinite as to make it nugatory. The object of the contract was to protect the depositors. The exact method of performance rested with the defendants. They had the choice so long as the depositors were protected. Under such circumstances, indefiniteness may not be successfully urged.

While the contract did not specify the exact time when performance by plaintiffs was to terminate and performance by defendants was to fall due, the rule is clear that a reasonable time is to be implied. (*Cohen & Sons* v. *Lurie Woolen Co.*, 232 N. Y. 112; *Weed* v. *Lyons Petroleum Co.*, 294 Fed. 725; Restatement of the Law of Contracts, § 32.) In any event, there having been full performance by the Comptroller and by Cooper, the question is no longer open.

The one debatable point as to whether or not a valid, enforcible contract was entered into is that nothing was said as to how the clearing house banks were to apportion the liability among themselves. It would be most unreasonable to assume that the liability alleged to have been incurred was to be joint and several. The effect of this would be to subject the bank with the smallest capital resources to the same amount of liability as the bank with the largest amount of capital. No such claim is made by the plaintiffs. The plaintiffs themselves apparently were not quite certain as to what formula was to be used in apportioning the liability. In their

complaint they alleged that it was to be on the same basis as that adopted by the clearing house in meeting its expenses, that is, on the basis of the amount of annual clearings by each bank. The defendants contend that it was not until settlements were arrived at with a number of the banks that the formula here sought to be invoked was considered in connection with this transaction, namely, apportionment of liability on the basis of capital funds at the time of the making of the agreement.

The indefiniteness complained of here is different from that existent in a contract under which the amount of liability is uncertain at the time of making but susceptible of proof at the trial. (Cf. *Stern* v. *Premier Shirt Corp.*, 260 N. Y. 201.) Here, though the amount of the total liability of all the banks is ascertainable, the amount for which each is liable can in no way be measured if the contract is deemed to be silent on that point. The amount of liability of each bank is, of course, an essential part of the contract, and the arrangement would have no legal, binding effect unless it is possible to read into it some practice or usage of sufficient definiteness to warrant the assumption that the parties contracted with reference to it.

While the question is by no means free from doubt, I hold that it was the usage of the clearing house, whenever concerted action was taken during financial crises for the common benefit of the members, to apportion liability on the basis of their respective capital funds at the time of the making of the agreement, and that this practice should be read into the present contract as an implied term thereof. I am not unmindful of the difference between the situation presented by the case at bar and other examples of collective action undertaken by the clearing house. However, the fundamental purpose sought to be accomplished and the risk of loss involved are so much alike, that by necessary implication the parties must have intended that the formula used in the earlier cases of collective action be deemed to apply to the alleged contract here involved. At least six times before 1932 they used capital and surplus as the basis. In 1930 they added undivided profits. The capital investment of a bank is taken to comprise its capital stock, surplus and undivided profits. (Willis and Edward, Banking and Business [1925], 170.) Until the declaration of a dividend, undivided profits are to be considered part of surplus. Some banks, indeed, do not carry the items in separate accounts, but group them both under the general heading of " surplus." That is a matter of accounting procedure and banking practice. No variance from the former practice occurred, therefore, in 1930 when undivided profits were expressly added to the formula. The difference that would

result in this case by including undivided profits or excluding them is negligible.

On this phase of the case I conclude, therefore, that there was nothing indefinite about the time, the manner or the extent of performance required. All of the essential requirements of a contract are here present. " It was meant to accomplish something. We find no such elements of vagueness as to justify the conclusion that in reality it accomplished nothing." (*Cohen & Sons* v. *Lurie Woolen Co.*, 232 N. Y. 112, 114.)

All of the elements of a valid contract being present in the arrangements made by McCain with Pole and Cooper, the next question is whether the contracts are binding on the defendant banks, or any of them. Did they authorize the contracts or ratify the action alleged to have been taken on their behalf?

In considering whether the contracts were authorized, the first question to determine is whether or not the clearing house committee and the chairman, as such, had power to bind the present corporate defendants. As to this, there is hardly room for doubt. The committee and the chairman, by virtue of their office, did not have any such authority. The constitution and the by-laws of the clearing house, which is a voluntary association, granted no such power. None of the defendant banks, therefore, can be held liable simply by reason of membership in the association. It would be subversive of sound banking and contrary to established public policy to hold otherwise.

As was intimated in dealing with the defense of *ultra vires*, it would be unlawful for the member banks to confer upon the governing body of the association, in advance, the broad general power to bind them to a guaranty of the deposits of another member. It would probably be unlawful, moreover, for the individual banks by general resolution to grant to the governing body of the clearing house the power to enter into engagements on their behalf looking toward a guaranty of the deposits of another bank, even if such power were limited by its terms to occasions of financial or banking crises. To escape the condemnation of *ultra vires*, each case would have to be considered and dealt with separately when and as it arises. Sound public policy dictates that the board of directors of a banking institution be not permitted to delegate in advance its legislative and judicial functions with respect to such an extraordinary arrangement.

The powers of the clearing house association or its governing body are not enlarged because of certain advertisements containing statements which on their face may be urged to have been misleading in character. In one such advertisement, for example,

it was declared that "The members take collective action when such course seems necessary to protect the funds of depositors." The advertisements will be discussed more fully, in another connection, later. If it be shown that the representations were false and that, in fact, any depositor was actually deceived and damaged thereby, he may, under proper conditions, have his remedy in tort. I am not called upon to pass on that question; it is not the cause of action on which the plaintiffs rely in this complaint.

Neither the advertisements nor the practice in the past can have the effect of conferring upon the clearing house or its governing body, as such, the power to enter into contracts binding on the member banks, of the character we are here considering. The clearing house committee had no implied or apparent authority to enter into any such engagements and did not acquire any such power under the doctrine of agency by necessity.

In fact, it is clearly established that McCain, acting as chairman of the clearing house committee, and the committee itself, did not purport to bind all member banks, but only those who were represented on the committee by their executive officers and those who were especially consulted and who, it is claimed, concurred in the action to be taken. It was expected that the others, for the most part the smaller banks, would follow along, but that was something they would have to decide for themselves.

It appears that the four members of the clearing house committee present at the July 12, 1932 meeting signed an agreement dated July eighteenth, a copy of which was sent to Cooper some time later, which purported to make the clearing house responsible, under certain conditions, for the payment to Cooper of a salary of $35,000 a year by the Harriman Bank for a period of three years for his services as president. We are not here concerned with the authority of the committee to bind the other member banks under that agreement. Obviously there is a marked distinction, not alone in degree but also in kind, between that contract and one for a guaranty of deposits.

The next question is whether the executive officers of the remaining defendant banks, not represented on the clearing house committee, authorized that committee, or its chairman, to enter into the alleged contract of guaranty of the Harriman deposits, on behalf of their respective banks. The executive officers of five of these banks were consulted; four were left entirely in the dark. It would serve no useful purpose to analyze the testimony on this point in detail. To mention certain items of the testimony and

omit others might well create an erroneous impression. Suffice it to say that a good deal was taken for granted in connection with this transaction. There are discrepancies and contradictions, which for the most part are due to the loose and casual manner in which the entire situation was handled.

There is not a scrap of writing to show authority of the committee to act on behalf of the remaining banks. No express promise by the executive officers who were consulted, that their banks would participate in the alleged undertaking, was shown or claimed. Here and there are certain remarks alleged to have been made from which the inference of authorization is sought to be drawn. Reynolds, one executive officer, is alleged to have said: " If there is a complete collapse of the Harriman, what will it cost the banks? " Others are said to have been told that it was necessary to stand behind the deposits. But those remarks are vigorously denied. An undertaking of this unusual nature should not be left to surmise; it should be based on clear, convincing, unambiguous testimony. When witnesses for the plaintiff were pressed to state whether or not any of the executives consulted said, in words or in substance, that their banks would stand behind an undertaking of the committee to protect or guarantee the deposits of the Harriman, the answer was " No," that there was " a negative commitment," and the commitment was " implied " from what was said, that there was acquiescence by silence, by failure to object. There is no evidence whatever that any of these executive officers ever saw or were told about the correspondence between the two chairmen of the clearing house committee and the Comptroller. Two such officers, Potter and Johnston, learned about this for the first time at the meeting of the clearing house committee on February 27, 1933.

The talks with the executive officers took place for the most part in May or early June, before the promises by McCain to Roberts, Pole and Cooper are claimed to have been made. There is no question but that the executive officers were told to a varying extent about the financial condition of the bank, that the committee felt it should be retained as a member of the clearing house, that arrangements were being made to effect a change in management, that the committee proposed to have a new president put in, that it was looking about for someone to take hold of the bank, rehabilitate it, and put an end to the irregularities which had been practiced. There is no doubt also that certain of the executive officers were asked if persons connected with their institutions

would be available for this purpose. The executive officers were told about all this, but I fail to find from the evidence that there was any mention of a guaranty of deposits, or standing behind the deposits. The inference I draw from the testimony, with all its vagueness and contradictions, is that McCain assumed that a guaranty of deposits was understood to follow from the procedure which the committee planned in connection with the Harriman. That assumption had no basis in fact or in law.

If these executive officers had empowered the committee to bind their banks to a guaranty of deposits, it is inconceivable that the matter would not have been taken up with them at regular intervals thereafter. In January, 1933, in connection with a contemplated arrangement to prevent suits of Harriman creditors, eight banks subscribed, to the extent of $25,000 each, to a loan for this purpose. Nothing was said at that time about any guaranty of deposits. It was the voluntary action of each bank consulted.

A contract of the kind we are here considering must rest upon a stronger basis. Months elapsed and not a single step was taken to reduce the alleged engagement of the banks to more tangible form, either verbally or in writing. A contractual structure cannot be imposed upon such dubious foundations. I conclude, therefore, that plaintiffs have failed to establish that an executive officer of any of the remaining defendant banks, expressly or impliedly empowered the clearing house committee on behalf of his bank to make the commitment claimed, or that such officer had notice that the committee had assumed to have any such authority.

It is urged that eliminating the disputed portions of the testimony, and on the basis of the admitted facts, it should be implied that the officers who were consulted authorized the committee to bind their banks to participate in the guaranty of the Harriman deposits.

In 1929 and in 1931 a series of advertisements was inserted in the press calling attention to the activities of the clearing house association. One of these advertisements contains the statement that no bank is eligible for membership unless it has a paid-up and unimpaired capital of $1,000,000 or more, that " the Association requires weekly reports from members and makes periodical examinations of the condition of each bank. These examinations give particular attention to the soundness of the assets of each member, and are made in the light of intimate knowledge of the affairs of the New York banks and of general conditions. The members take collective action when such a course seems necessary to protect the funds of depositors."

The advertisement further stated, "If you are a depositor of a Clearing House bank you can feel that, in addition to the safeguards provided through Federal and State supervision, your funds have the protection afforded by membership in an organization whose fundamental purpose is to assure sound banking."

It also appears that at the conclusion of a conference with the Governor on March 3, 1933, the day before the national bank holiday, a statement was issued in the early hours of the morning reciting among other things, that the clearing house banks in New York could, through the facilities of the Federal Reserve Bank, pay on demand every dollar of their deposits. Davison prepared the statement, and he testified that the entire committee aided in its drafting. Johnston stated at the trial that he was the only other member of the committee present when it was drawn. They both testified that neither of them had the Harriman Bank in mind at the time. In any event, the statement has no real significance in this case; no one was deceived thereby; no deposits were thereafter received by the Harriman; there was not subsequently the slightest change in the status of the bank.

The plaintiffs urge that having in mind the assurances to the public set forth in these advertisements, the steps taken to bring about a change in management and the information concerning the condition of the Harriman given to the executive officers of the banks which were consulted, the retention of the Harriman as a member of the clearing house could only be justified on the theory that the other member banks had undertaken to protect its deposits; that no man who had the experience of Cooper in the banking field would have consented to assume the presidency of an insolvent institution or one about to fail; and that the executive officers, knowing all this, must be deemed to have empowered the committee to bind their banks to the commitments alleged.

The clearing house committee had the right to impose reasonable requirements as a condition to permitting the bank to retain its membership in the association. It was the function and the duty of the committee to check up the financial operations of the bank, to order a discontinuance of irregularities, and, if necessary, to require a change in management. There is no basis for implying an undertaking to guarantee deposits because the officers of certain member banks were informed that the committee was following this course.

It may be argued that the retention of the Harriman Bank as a member of the clearing house association, particularly in the

light of the earlier advertisements, was calculated to give the public the impression that it was solvent. The strange thing about it all is that McCain and others thought that the bank could be rehabilitated. In his letter of August 24, 1932, to the Comptroller, McCain said, " frankly, we believe the institution is thoroughly solvent as a ' going ' bank." Even Cooper believed that the main trouble with the bank was insufficient liquidity of assets.

The total amount of new deposits in the Harriman Bank after the alleged contracts were made amounted to $3,453,519.23. The record is silent, however, on how much of this amount remained on deposit when the bank failed to reopen after the bank holiday. Let us assume that the retention of the Harriman as a member of the association was improper; that it was not an action designed to inspire public confidence in the management of our banking institutions. But in this suit we are not concerned with the rights of a depositor deceived and damaged by what had taken place. This complaint is not framed in tort. Its basis is, in substance, the making of a contract of guaranty.

I am unable to imply, from their knowledge of the condition of the bank, their acquiescence in the change of management and in the retention of the Harriman as a member of the clearing house, any legal obligation on the part of other member banks to guarantee the deposits of the Harriman. Perhaps the correct interpretation of what occurred is that indicated by Buckner in his telephone conversation with Johnston, who after the bank holiday went to Washington and informed the Acting Comptroller that the banks would not take steps to protect the depositors. Buckner, whose sincerity is evident, then said: " There are a number of us who recognize a moral commitment and the question is now coming up very definitely as to whether, recognizing a moral commitment, it would not be a wise thing for those of us who so recognize to simply so notify the Comptroller — that we will stay by our *pro rata* share of the loss and let those who don't want to recognize it, stay out."

But I go further in this case. An executive officer has no power to bind his bank, or to authorize any one else to do so, to a contract guaranteeing the deposits of another institution without the approval of the board of directors of his bank or without knowledge thereof by the directors and their failure to repudiate.

It is urged that the executive officers of the banks who were consulted had either actual or implied authority to bind their respective institutions in the manner here claimed. There is nothing to show that these officers had express authority to make any such commitments, nor is there anything in the record from

which it may be found that there was a well-established practice for officers to engage in such undertakings on behalf of their institutions, which exercise of authority was acquiesced in by their boards.

Comments in the cases and in the text books with respect to the powers of the president of a bank are rather startling when considered in connection with this case. The general control and government of the affairs and transactions of a bank rest with the board of directors. For such purposes the board constitutes the corporation.

" The president is but the executive agent of the board of directors, to perform such duties as may be devolved upon him; he is not the corporation, and cannot take the place of the governing board, and make contracts or incur liabilities outside of the ordinary business of the bank, without special authority." (3 R. C. L. 440.)

The rule is clearly laid down by a leading authority on the subject: " Usage or directorial votes may confer upon him [the president] special functions, and may extend his authority to correspond with the increase of active duties. But the authority inherent in the office itself is very small; indeed, it is very difficult to say precisely how or wherein it is really much in excess of that which can be exercised by any other single director. Practically this legal principle is not known, or not distinctly recognized, in very many banks, and frequently presidents undertake to exercise a very considerable control in the daily routine of business. When this is done with the knowledge and approbation, or the tacit sanction, of the board of directors, it may be regarded as legalized by the principles of ratification or usage. Yet these afford an indefinite and dangerous basis on which to rest important dealings. A careful collation of all the adjudicated cases, it must be confessed, wears a striking and peculiar aspect, which is not very favorable to the assumption of any species of executive power by a bank president without direct authorization. With scarcely an exception, all the decisions are to the effect that the president had no right to perform some particular act, which he had undertaken probably in perfectly good faith to perform, and which had been called in question, and had given rise to the litigation in which it was condemned." (1 Morse Banks & Banking [6th ed. 1928], 374. See, also, 2 Fletcher Cyc. Corp. [1931] 434.)

Persons with whom the president or other executive officers deal are bound in law to take notice of this limitation of authority, and cannot ordinarily enforce a contract made by such officer, out

of the usual course of the company's business, against the corporation.

" Even if the president be deemed to have power to act in behalf of the corporation, or there is a presumption in favor of his authority, the power does not extend to acts outside the ordinary course of business, nor to acts mirely for his own benefit." (2 Fletcher Cyc. Corp. [1931] § 592.) (See, also, *Watkins Salt Co.* v. *Mulkey*, 225 Fed. 739, 745 [C. C. A. 2d Cir., 1915].)

In *Schwartz* v. *United Merchants & Mfrs., Inc.* (72 F. [2d] 256) the court held that, under the New York cases, the president and vice-president of the defendant corporation were without authority to enter into a contract without the knowledge of the directors of the corporation whereby a new company to be formed was to become the selling agent of the defendant's subsidiaries and the salary of the plaintiff was to be guaranteed by the defendant in return for a contribution of capital from the plaintiff. LEARNED HAND, Cir. J., said (pp. 258, 259): " We conclude therefore that there is no absolute rule in New York that any contract which the president of a company may make, however out of the ordinary, throws upon the company the duty of showing that he was unauthorized. It is true that whatever powers are usual in the business may be assumed to have been granted; but the presumption stops there, as much in the case of a president as of any other officer, though naturally in degree they may greatly differ. If so, it seems to us apparent that if any contract needed the express authority of the directors it was this." (See, also, *Heaman* v. *Rowell Co.*, 261 N. Y. 229, 231; *Commonwealth Trust Co. of Pittsburgh* v. *First-Second National Bank of Pittsburgh*, 260 Penn. St. 223; 103 A. 598.) There is a special reason for applying this rule where a contract is apparently *ultra vires*, even though it may not actually be so.

I am not unmindful of the fact that there is a tendency on the part of the executive officers of large banking institutions to assume an attitude of proprietorship with respect to the banks they represent. That is not a practice to which the court should lend its sanction, particularly in an unusual situation such as is here presented. The directors of a banking institution are responsible for the conduct of the affairs of their bank. They owe a duty to their depositors and their stockholders, who have a right to look to them for the proper management of the institution in which they hold office. The directors are held to strict accountability, civil and criminal, for malfeasance and for misfeasance in the administration of the affairs of their institutions of which they have knowledge

or concerning which, in the exercise of ordinary prudence, they should know. Their ignorance of what has taken place is no excuse, where there was a duty to know. They are, in effect, trustees and are held to the same degree of care as trustees. (*Kreitner* v. *Burgweger*, 174 App. Div. 48, 52; *Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185, 193; *Bosworth* v. *Allen*, 168 id. 157.) The conception of the " nominal director " has been rejected by the courts. (*Kavanaugh* v. *Commonwealth Trust Co.*, 223 N. Y. 103; *Hun* v. *Carey*, 82 id. 65.) It would be inconsistent to hold directors to this measure of responsibility and at the same time permit executive officers of the institution, acting without express or implied authority, to enter into engagements of the character we are here considering. (Cf. *People* v. *Mancuso*, 255 N. Y. 463.)

There are no elements of estoppel in this case. The doctrine of agency by necessity has no application here. It is invoked only where there is an emergency requiring immediate action by the agent, and is generally limited to cases where action must be taken at once for the physical preservation of some person or object. If the agent has an opportunity to consult his principal before he takes action, the doctrine may not be invoked. No condition requiring immediate emergency action existed here. The bad financial condition of the Harriman Bank was known to the clearing house committee for a long time. Months went by before Cooper was selected as the temporary president. There was ample opportunity to place the matter before the boards of the various banks. The failure to do so is not excused by the explanation that secrecy was essential and that the whole plan would fail if disclosed to the directors. An examination of the depositions submitted by the plaintiffs shows that wide publicity was given promptly in a number of instances in which similar situations were dealt with in other States.

It is further claimed that even if the officers had no power to bind their banks to participate in the guaranty or to authorize anyone else to do so, they had notice that the clearing house committee was about to exercise such authority. It is contended, therefore, that notice to these officers was notice to their banks, upon whom rested the affirmative duty promptly to disavow the unauthorized action; that having failed so to do they must be demed to have acquiesced and adopted it.

The evidence, as has already been pointed out, is insufficient to warrant a holding that the officers consulted had such notice. But assuming that they had, the doctrine of imputed knowledge would

have no application here. The knowledge of the agent will be imputed to the principal only if the former was acting within the scope of his authority, actual or apparent. (*Ingalls* v. *Morgan*, 10 N. Y. 178; *Bosak* v. *Parrish*, 252 id. 212; *Butler* v. *Michigan Mut. Life Ins. Co.*, 184 id. 337; *Corrigan* v. *Bobbs-Merrill Co.*, 228 id. 58, 68, 71; *Drainage Commission of New Orleans* v. *National Contracting Co.*, 136 Fed. 780.)

In *Watkins Salt Co.* v. *Mulkey* (225 Fed. 739, 746) the court said: " But no one should seriously contend that if a president of a corporation makes an unauthorized contract, which, if valid, would affect the rights of his corporation, his knowledge of the transaction is to be imputed to the corporation, or that it is to be presumed, in the absence of any evidence to the contrary, that he communicated his unauthorized act to his board of directors. The mere statement of the proposition, it seems to us, carries its refutation upon its face."

Even if the executive officers attempted to exercise no authority on their own account, but acquiesced in the wrongful assumption of authority by another, those officers would not be acting within the scope of their employment, and their knowledge would not be imputed to their board. It would be fruitless to indulge in additional hypotheses. The facts in this case afford no basis for them.

An examination of the numerous cases cited by plaintiffs indicates that they fall within three general classes: (1) Those in which the principal had actual knowledge of the unauthorized act of his agent and failed within a reasonable time thereafter to repudiate. (*Cairnes* v. *Bleecker*, 12 Johns. 300; *Story* v. *Furman*, 25 N. Y. 214; *First Nat. Bank* v. *Commercial Travelers Home Assn.*, 108 App. Div. 78; affd., 185 N. Y. 575; *Muentzer* v. *Los Angeles Trust*, 3 F. [2d] 222.) (2) Those in which the knowledge of the agent was imputed to the principal, where the agent was acting within the scope of his authority. (*Village of Port Jervis* v. *First Nat. Bank*, 96 N. Y. 550; *Shattuck* v. *Guardian Trust*, 204 id. 200; *Pittsburgh, Cincinnati & St. Louis R. Co.* v. *Keokuk & Hamilton Bridge Co.*, 131 U. S. 371.) (3) Those cases dealing with notice of facts brought home to the principal, which did not involve the authority of the agent to take action in connection therewith. (*Potts & Co.* v. *Lafayette Nat. Bank*, 269 N. Y. 181; *Metropolitan Club, Inc.*, v. *Hopper, McGaw & Co.*, 153 Md. 666; 139 A. 554; *Gold-Mining Co.* v. *Nat. Bank*, 96 U. S. 640; *Dr. Jaeger's Sanitary Woolen System Co., Ltd.*, v. *Walker & Sons*, 77 L. T. R. [N. S.] 180.) The case of *London & Lancashire Indemnity Co.* v. *Fairbanks Steam Shovel Co.*

(112 Ohio St. 136; 147 N. E. 329), cited by the plaintiffs, tends to support their contention on this point. In that case, however, (a) a business and not a banking corporation was involved; (b) the guaranty resulted in a total claim against the defendant of $2,854.85 and was incidental to the ordinary business of the company; (c) there were direct representations by the officers of the defendant to the other contracting party and this furnished the real basis of the decision — that the corporation should be held, not on the theory of ratification, but on principles of equitable estoppel.

The elements of estoppel are not here present. The officers of the banks made no representation at all to any of the plaintiffs or their predecessors in interest. The contract alleged is not one within the ordinary range of the powers of executive officers. It is something for the board of directors alone, and that being so, only actual knowledge or information from which the board could reasonably be expected to deduce the facts, would require repudiation. There is nothing to show that any such knowledge was brought home to the directors of the various defendant banks until after the national bank holiday. There was then prompt repudiation.

It is finally contended that, in any event, some of the corporate defendants adopted resolutions during the bank holiday which had the effect of ratifying the action of the clearing house committee. Reference has already been made to the fact that early in March, 1933, after the bank holiday, some of the banks repudiated the action taken by the clearing house committee and its two chairmen. It further appears in the testimony that when the matter was considered informally at a general meeting of clearing house members, it was stated that whatever action the banks would take was to be conditioned on participation by all. Buckner, Davison and others so testified. Any bank through its board of directors had the right to waive this condition; others could insist upon it.

Two of the defendants, the Guaranty Trust and the Fifth Avenue Bank, adopted no resolutions. The board of the Bankers Trust resolved that "no definite action * * * should be taken * * * in the absence of information as to the maximum liability which Bankers Trust Company would assume." There was no meeting of the board of directors of the Chemical Bank. Certain of its directors, thirteen in number, less than a majority, attended a conference at which the subject of participation in an arrangement to pay the Harriman depositors was considered. The group

recommended action that involved compliance with several conditions, one being " that no action committing the Chemical Bank and Trust Company to any payment or liability whatever should be taken unless similar action was taken on a *pro rata* basis by all other members of the Clearing House Association." Clearly, as to the foregoing four banks, the resolutions, or lack of them, may in no sense be interpreted as a ratification of the contract previously made and purporting to bind them.

The Bank of the Manhattan Company adopted resolutions authorizing certain of its officers to enter into an arrangement of the kind mentioned, but on the express condition that none should be made unless the same or similar arrangements were made by all members. The resolution of the First National Bank contained the express condition that the authority given to its officers to enter into such an arrangement was not to be exercised unless substantially all of the other members of the clearing house association joined therein. The three smaller banks, the Title Guarantee, the Public National and the Continental Bank, authorized an officer to take any necessary action to participate in the arrangement mentioned. These resolutions, like those adopted by all the other banks, contained a provision that the liability of the bank was to be limited to a *pro rata* portion determined in accordance with the formula to be prescribed by the clearing house committee.

I hold that the resolutions adopted by the five banks last named do not amount to a ratification of the arrangements purporting to have been made by the clearing house committee. Intent is a prerequisite to ratification. " If that intention cannot be shown, no ratification can be held to have been established." (*Merritt* v. *Bissell*, 155 N. Y. 396, 401.) There is no ratification if the alleged principal intended merely to settle or compromise a claim. (*Bunting Bull Co.* v. *City of Mt. Vernon*, 217 N. Y. 510.) A principal may place conditions on his ratification (*Scott* v. *Los Angeles Mountain Park Co.*, [Cal. App.] 267 P. 914; *Lanahan* v. *Clarke Car Co.*, 11 F. [2d] 820), and the rule is well established that conditions attached to a writing which is in form complete may be proved by parol. (*Blewitt* v. *Boorum*, 142 N. Y. 357; *Reynolds* v. *Robinson*, 110 id. 654; 2 Williston Cont. [1920] § 634.)

The action taken in connection with any of these resolutions was directed to the settlement of a controversy, not to the payment of a pre-existing and recognized obligation.

It is difficult to see how there can be any real question of ratification with respect to the three so-called smaller banks whose

resolutions on their face were unconditional. No one assumed to commit them to the alleged guaranty. As a general rule, a principal cannot be said to ratify the act of an agent, so called, unless in the first instance the agent purports to act for that principal. (*Hamlin* v. *Sears*, 82 N. Y. 327, 331.) An unusual case may arise, however, where, as the result of clear and definite expression, one may be held to have adopted the unauthorized action of another who did not even assume to act as his agent. No such situation is here presented.

This is not the kind of a case where ratification should be forced on a bank against its will, for, as has previously been pointed out, the only theory on which a contract of the kind here in suit can be sustained as *intra vires*, is that it is the result of voluntary action by the board of directors of an institution based on their judgment that the security of their depositors and the interests of their stockholders required it.

From what has already been said, it is clear that the liability of the individual defendants has not been established in accordance with the allegations of the complaint, even if consideration be given to the amplification attempted by the bill of particulars (Par. XXXVIII). Potter and Johnston were not members of the clearing house committee in office when the promises are alleged to have been made to the Comptroller and to Cooper. On no theory can they be held liable for breach of warranty of authority in connection with those promises. They became members of the clearing house committee in October, 1932. There is nothing to show, however, that they had any knowledge of the commitments or that they knew of the correspondence between McCain and the Comptroller, until the meeting of February 27, 1933. At that time the chairman, Davison, read his letter of February 2, 1933, to the Acting Comptroller confirming McCain's letter to the Comptroller of August 24, 1932. The evidence is insufficient to justify a finding that the individual defendants assented thereto. They may not be deemed to have warranted their authority to make the commitments asserted, either as members of the clearing house committee or as officers of their respective banks.

It is unnecessary, therefore, to consider the question of whether the courts in this jurisdiction recognize warranties for the benefit of third persons. (Cf. *Giminez* v. *Great Atlantic & Pacific Tea Co.*, 264 N. Y. 390; *Smith* v. *Davison*, N. Y. L. J. July 21, 1934, p. 203.)

In a case of this importance with so many complications, it has been necessary to go into some detail. Notwithstanding this, many matters have not even been touched upon, although the entire record has been subjected to close scrutiny and analysis. Every step taken in connection with the transactions under consideration tended, however unintentional, to have added to the confusion. It is easy, of course, from the present point of vantage to say what should or should not have been done. There is always the greater wisdom gained after the happening of an event.

Probably no one who participated in these transactions can now indulge in comfortable reflections on what took place. Many things were done in a loose, casual, unorderly fashion. This court is called upon to determine the issues in accordance with established legal principles. The plaintiffs have failed to make out their case against the remaining defendants herein in the manner required by law.

Judgment is accordingly directed in favor of the defendants, and appropriate exceptions allowed to the plaintiffs. No costs will be awarded. Submit findings of fact, conclusions of law and judgment on notice in accordance with the foregoing opinion.