LOUIS LEVINE and Others, etc., Plaintiffs, *v.* SOSTHENES BEHN and Others, Defendants.

Supreme Court, Special Term, New York County, June 5, 1940.

*A. Alan Lane,* for the plaintiff Louis Levine.

*David L. Stehr* [*A. G. Warner, J. A. Aisley* and *Sydney V. Levy* of counsel], for the plaintiffs A. and J. Caruso.

*Guy Cary* [*Joseph M. Proskauer, J. Alvin Van Bergh* and *Robert Nias West* of counsel], for himself and the defendants Behn, Calder, Grace, Milliken, Raitschler, Swenson, Swope and Franklin, executors.

*Shearman & Sterling,* for the defendants Simpson, executors.

*Zalkin & Cohen* [*Barney B. Fensterstock* and *Joseph M. Proskauer* of counsel], for the defendant National City Bank of New York.

WALTER, J.   Three individuals owning a total of thirty-three shares of stock of the National City Bank of New York here seek to compel certain of its directors to repay to it $725,000, which they caused it to pay in discharge of a claim asserted against it and its president.   Summary judgment was granted (169 Misc. 601; affd., 257 App. Div. 156) but afterwards reversed (282 N. Y. 120).   In view of the reversal I understand that I not only may but also am required to exercise my own independent judgment and form my own conclusions with respect to the facts (*Gugel* v. *Hiscox,* 216 N. Y. 145), but that does not mean that I must disregard the argument that a justice of this court and three justices of the Appellate Division have expressed the view that upon the showing made upon the motion for summary judgment the suit is without merit, whereas all that the Court of Appeals and the dissenting justices of the Appellate Division have said is that the case presents issues which should be tried.   (*Gugel* v. *Hiscox, supra,* p. 152.)

In December, 1933, a suit against the twenty banks of New York city who were members of the New York Clearing House Association was brought by the Comptroller of the Currency of the United States and the receiver and the president of the Harriman National Bank and Trust Company to compel performance of an alleged

agreement by said banks to pay such amount as might be required to pay in full the depositors of the Harriman Bank. The suit also asserted, as an alternative cause of action, that if the banks never authorized or ratified the alleged agreement, then certain of their executive officers should be held liable upon the theory of a breach of warranty of their authority to make the same on behalf of their respective banks. The sum demanded was not specified, the amount required to pay the depositors of the Harriman Bank not being then determined. It was alleged, however, that such amount should be prorated in accordance with the percentages customarily used by the Clearing House Association in assessing its members for the expenses and charges thereof. In June, 1934, nine of the banks so sued, after having interposed answers denying liability and setting up affirmative defenses, paid a total of $2,848,950 in discharge of the claim as against them and their executive officers, and in July, 1934, a tenth bank paid $18,993 in discharge of the claim as against it. The agreement under which the payments by the nine banks were made states that the amount for which judgment was sought was uncertain but was believed to be substantially in excess of $6,331,000, and the payments made by those ten banks were of such computed percentages of $6,331,000. In April, 1936, just as the suit was about to be tried, the National City Bank paid $725,000, which was its so computed percentage of $5,000,000. The suit was then tried as against the remaining nine banks and two executive officers, and it resulted in a judgment dismissing the complaint. (*O'Connor* v. *Bankers Trust Co.*, 159 Misc. 920; affd., 253 App. Div. 714; affd., 278 N. Y. 649.)

Defendants here concededly believed and were advised by counsel that the agreement alleged in the *O'Connor* suit never was made or ratified by National City Bank and if made it was not valid or enforcible, but the contrary was asserted vigorously and in good faith by high and responsible officials who were prosecuting the suit by able and eminent counsel, and the suit was far from being palpably unfounded, and if defendant directors voted to compromise the claim by paying a sum less than the possible recovery it is clear that, in the absence of fraud or collusion, which are not here alleged or proved, such compromise could not be attacked by minority stockholders.

It is here contended that defendant directors did not compromise, that they actually paid in full a legally unenforcible claim, and that they thus in effect made a gift of the bank's money. I do not think the facts warrant such a characterization. It is true that there never was any dispute that upon the basis of proration asserted in the *O'Connor* complaint the National City's proportion was

fourteen and five-tenths per cent of the amount required to pay the Harriman depositors, and it is true that defendant directors voted to pay that percentage of what the plaintiffs in that suit then estimated as the amount required for that purpose. It also is true that upon the trial of that suit that amount was found to be less than previously estimated, viz., $4,862,801.70. (See *O'Connor* v. *Bankers Trust Co., supra,* p. 924.) But while the amount paid by the National City is thus somewhat greater than the amount at which its liability would have been fixed if it had been found liable in that suit, it also is smaller than what was claimed by the plaintiffs in that suit when the other ten banks settled in 1934, and there is nothing to show that there ever was any certainty, prior to the trial of the *O'Connor* suit, that the award required to pay the Harriman depositors would not exceed $5,000,000. In short, when the National City made its payment the amount of its liability, if any, was uncertain and unknown, and, therefore, it cannot accurately be said that the payment made was payment in full rather than a payment by way of compromise. It also is to be noted in this connection that the payment was made under terms which secured to the bank a right to receive something back in case it turned out that the whole was not required to pay the Harriman depositors in full.

Assuming however, that the payment voted was payment in full, it still does not follow that the payment was in effect a gift. The right of directors to compromise a disputed claim rests upon their right to manage the affairs of their corporation according to their honest and informed judgment and discretion as to what is for the best interests of the corporation, and that right to consider the best interests of the corporation is equally applicable to and equally may support a payment in full of a claim even though they themselves believe, and it subsequently is judicially determined, that the claim is not legally enforcible. The principal if not the sole difference between compromising and paying in full is that in the case of a compromise the saving of the difference between the amount paid and the possible liability generally supplies an obvious reason for the compromise, whereas in the case of payment in full the reasons for paying in full rather than awaiting the outcome of a litigation are not so obvious. The test in each case, however, is the same, viz., whether or not the directors acted honestly and diligently and with a view to the promotion of the interests of the corporation. Of course, neither actual good faith nor advice of counsel will save directors if the facts afford no reasonable basis for a belief that a payment is for the best interests of the corporation. Honest belief without any basis in fact must be attributable to

negligence. But if directors reasonably believe that they are promoting the interests of the corporation, a payment in full cannot be attacked any more than a compromise.

In the case at bar it is not claimed that the directors acted fraudulently. Neither is it claimed that they acted negligently in the sense that they failed to give the matter full and careful attention. The charge that they acted recklessly and wrongfully is predicated solely upon the claim that by paying a legally unenforcible claim in full they necessarily paid out the bank's money without the bank's receiving any consideration therefor or benefit therefrom, and that claim, in my opinion, is conclusively disproved by the evidence.

The evidence shows that defendant directors voted to pay on the very eve of the trial and after they had received advice that upon the trial the plaintiffs in the *O'Connor* suit would make a vigorous special " attack " upon the National City Bank and its condition in 1932 and 1933 for the purpose of showing that it had special reasons of its own for not wanting the Harriman Bank to fail, and that the avoidance of that " attack " with its resulting injury and damage to the bank was the motivating cause of the payment. There is nothing to indicate that there ever was any intent to charge that the bank was or had been insolvent, and the defendant directors are emphatic in their assertions that the threatened " attack " was wholly unfounded. On the other hand, in June, 1932, one month before the agreement sued upon in the *O'Connor* suit was alleged to have been made, the bank had transferred $22,000,000 from surplus and undivided profits to reserves; early in 1933 it had been subjected to unfavorable publicity in a Senate investigation and in consequence thereof there had been substantial managerial changes; in March and October, 1933, additional sums, aggregating $36,000,000, had been added to reserves; at end of 1933 there had been a reduction in the par value of the bank's stock in order to free $46,000,000 from capital and transfer it to surplus; the bank had issued $50,000,000 of preferred stock which had been taken by Reconstruction Finance Corporation; assets had been written down. Those bald facts were publicly known. The intimate details thereof were known to the Comptroller of the Currency, who was one of the plaintiffs in the *O'Connor* suit. It thus is easy to see that skillful questioning by counsel for the plaintiffs in that suit with respect to known facts conceivably might destroy the bank's defenses, and even if it did not do that it was not at all improbable that it would create further unfavorable publicity for the bank; and some indication of the possible effect of such publicity upon the bank is afforded by the

fact that in March, 1933, the bank's deposits were "off" by $300,000,000, and by April, 1936, when the payment complained of was made, they had increased over the March, 1933, figure by $700,000,000. Deposits, of course, are affected by many factors, but it certainly was reasonable for the directors to conclude that unfavorable publicity resulting from the trial of the *O'Connor* suit following so quickly upon previous unfavorable publicity might seriously affect the bank's deposits as well as affect it in other respects. Undoubtedly $725,000 seems like a large sum to pay for the avoidance of unfavorable publicity, but it must be remembered that the bank involved is one whose deposits ranged from $1,023,000,000 in March, 1933, to $1,700,000,000 in April, 1936. Loss of less than ten per cent of its deposits easily might cause this bank an actual money loss of more than the amount paid in less than a single year, and no one, even today, can say that by paying the bank actually is worse off by a single dollar than it would have been if it had litigated and had been successful in winning the lawsuit.

I accordingly find and conclude that the directors had reasonable cause to believe that a trial of the suit, even if resulting in a judgment of no liability, might cost the bank a greater sum than that paid, that they did so believe after giving the matter due consideration, and that they voted the payment because of that belief. They were not actuated by any desire to save from personal liability the executive officer who had been joined with the bank as a defendant in the *O'Connor* suit or by any other improper motive or purpose.

A fact established upon the trial which did not appear upon the motion for summary judgment is that one director who voted for the payment had a deposit of $386.95 in the Harriman Bank and that six very large corporations of which one or two of the defendant directors were directors had deposits therein totaling about $55,000. On the other hand, it also was proved upon the trial that the defendant directors all had substantial stockholdings in the National City Bank and that the total holdings of such directors and their families aggregated over 850,000 shares. The payment was clearly against the personal financial interests of the directors who voted for it. To a very substantial extent they were voting a payment out of their own pockets.

Judgment for defendants. Settle judgment upon notice.