## NATIONAL CITY BANK OF NEW YORK v. GOESS et al.

### No. 281.

Circuit Court of Appeals, Second Circuit.

July 25, 1942.

---

Joseph M. Proskauer, of New York City, for National City Bank and the banks.

Shearman & Sterling, of New York City, for plaintiff-appellant.

Milbank, Tweed & Hope, of New York City, for defendants-appellants Chase Nat. Bank of City of New York and Lawyers Trust Co.

Sullivan & Cromwell, of New York City, for defendants-appellants Bank of New York, Commercial Nat. Bank & Trust Co. of New York, and Marine Midland Trust Co. of New York.

Larkin, Rathbone & Perry, of New York City, for defendant-appellant Central Hanover Bank & Trust Co.

Spence, Windels, Walser, Hotchkiss & Angell, of New York City, for defendant-appellant Corn Exchange Bank Trust Co.

Davies, Auerbach, Cornell & Hardy, of New York City, for defendant-appellant Irving Trust Co.

Chadbourne, Wallace, Parke & Whiteside, of New York City, for defendant-appellant Manufacturers Trust Co.

Sage, Gray, Todd & Sims, of New York City, for defendant-appellant New York Trust Co.

Niles & Johnson, of New York City (Ralph Q. Kelly, of New York City, of counsel), for Federal Debenture Co. Inc., individually and as representative and on behalf of general creditors of Harriman Nat. Bank & Trust Co.

John Vance Hewitt and Conboy, Hewitt, O'Brien & Boardman, all of New York City (Edward F. Butler and Henry A. Jones, both of New York City, of counsel), for defendant-appellee, Frederick V. Goess, receiver of Harriman Nat. Bank & Trust Co. of City of New York.

Martin D. Jacobs, Hodges, Reavis, Pantaleoni & Downey, and Aaron W. Berg, all of New York City, for depositors Virginia H. Berg and others, trustees, individually and on behalf of all other depositors.

Charles Kimmich, pro se.

Raymond T. Heilpern and Krause, Hirsch & Levin, all of New York City, for impleaded defendant-appellee, Sydney Krause, of New York City, as trustee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The principal appeal herein is by the plaintiff from a judgment interpreting assignments executed to it and ten other banks by certain depositors of the Harriman Bank. The defendants other than the banks were later impleaded on motion of the receiver of the Harriman Bank who had been made a defendant; they were all depositors except Federal Debenture Company, which was, however, a creditor. The facts as developed upon the hearing were as follows. The Comptroller closed the Harriman Bank in March, 1933, and in December of that year he and the bank's president brought an action in the state court, called the O'Connor action, on behalf of all the depositors against twenty banks, eleven of whom are parties here. The plaintiffs in that action alleged that the twenty banks had agreed through their agent, the New York Clearing House, that in consideration of the Comptroller's letting the Harriman Bank stay open during 1932 and of one Cooper's becoming its president, they would in effect guarantee the payment in full of all deposits, the liability of each bank being limited to its proportion of the clearing house expenses, as fixed by custom. Nine of the eleven banks, now parties here, settled this action on June 8, 1934, by a contract between themselves and the Comptroller, the receiver and Cooper. Each of the nine promised to pay its clearing house proportion of the sum of $6,331,000, then supposed to be less than the depositors' eventual loss, this promise being conditional upon the assent of ninety per cent of the depositors and upon the approval of the District Court for the Southern District of New York. The banks were to pay the money to the receiver to be held in trust by him and by him paid to the assenting depositors "upon delivery * * * to the Receiver of an executed release and assignment" in a form annexed to the contract. As this assignment and another which superseded it are the crucial documents in the case, we quote the important part of both in full. The first read as follows. *"And subject* to the right of the undersigned depositor * * * first to receive in the aggregate, from all sources, one hundred per cent. of the principal amount of his deposit account * * * with said Bank—The undersigned, for value received, hereby Assigns and Transfers to the Chase National Bank * * * as trustee for the benefit of the banks and trust companies hereinbefore released, 45 per cent. of the claim of the undersigned as a general depositor thereof."

On June 29th the receiver sent to all depositors a copy of the agreement with the proposed release and assignment, and advised them that the proposal would come on for the approval of the district court on July 19th. A tenth bank joined the nine in July, and on August 1st the receiver wrote again to all depositors, saying that the court had approved the settlement and enclosing an "assent" to the plan. By October 18th the required ninety per cent had assented, and the receiver sent to all who had done so a release and assignment in one document, of which the assignment somewhat varied from the first. This one read as follows. "Subject to the right of the undersigned first to receive in the aggregate, from all sources, one hundred per cent. of the principal amount of said deposit account * * * the undersigned * * * Assigns and Transfers to the Chase National Bank * * * as trustee for the benefit of the banks and trust companies hereinbefore released * * * 45.3 per cent. of the claim of the undersigned as a general depositor * * * to the end that after the undersigned shall have received from all sources one hundred per cent. of the principal amount aforesaid, the trustee shall take by way of subrogation 45.3 per cent. of any dividends thereafter payable upon the undersigned's claim." (The figure 45.3 represented the aggregate clearing house percentages of all the ten banks which had up to that time agreed to settle.)

On July 25, 1933, and therefore even before the O'Connor action had been begun, the Comptroller had paid out of the bank's assets a first dividend of fifty per cent upon all claims; on November 29, 1935 he paid a second of ten per cent; on August 13, 1937 a third of 10.25 per cent; and on December 5, 1939 a fourth of ten per cent. On October 29, 1934 the receiver paid sixteen per cent of the face of their claims to all depositors who had accepted the settlement with the ten banks, out of the funds paid by them. In April of 1936 the plaintiff, whose clearing house percentage was 14.5, made a similar settlement with the Comptroller and the receiver and paid its proper share, out of which the receiver on June 4, 1936, paid to all assenting de-

positors 3.75 per cent of the face of their claims. (The assignments given by those depositors who assented to this agreement and who were for the most part the same as those who had assented to the first, were precisely like the first except for the difference in percentage.) In June, 1936, the O'Connor action was tried and dismissed, O'Connor v. Bankers Trust Co., 159 Misc. 920, 289 N.Y.S. 252, and the judgment was finally affirmed in July, 1938. 278 N.Y. 649, 16 N.E.2d 302. On December 5, 1939 the sum of the Comptroller's four dividends (80.25%) and of the receiver's two payments out of the banks' money (19.75%) equalled 100 per cent of the principal of the depositors' claims and the condition of the assignments was then fulfilled. The judge decided that the defendant, Chase National Bank, as trustee for itself and the other nine original banks, was entitled to 45.3 per cent of any future dividends payable to those depositors who had executed assignments to those banks; that the plaintiff was entitled to 14.5 per cent of any future dividends, payable to those depositors who executed assignments to itself; and that the remainder of any future dividends should be paid to the assenting depositors. The correctness of this distribution is the main question; there are other incidental ones, but it will be more convenient to reserve them for the time being.

 The banks' argument is as follows. When the first contract was made on June 8, 1934, fifty per cent of the claims had already been extinguished by payment of the first dividend. The assignments are to be understood as transferring 45.3 per cent of so much of the "claims" against the Harriman Bank as remained, not of such future dividends as might be declared—this distinction they regard as crucial. It is not apparent to us how a claim against a corporation which is being wound up can be other than a claim to the dividends in liquidation; but as an answer to that question does not enter into our reasoning, we are content to accept the premise arguendo. The banks concede, as indeed they must, that if there were nothing to the contrary in the agreement, any future dividends would extinguish the assigned and retained parts of the claims pro rata; i. e. they would not be marshalled against either and would not therefore affect the assigned percentage. Title Guarantee & Trust Co. v. Mortgage Commission, 273 N.Y. 415, 7 N.E.2d 841. But they say that, because the depositors were allowed to keep the entire amount of those dividends which were declared after the assignments were executed, the rule did not apply and the retained part of the claims was extinguished by August 13, 1937, the day of the third dividend. Therefore, they conclude, the assignees are now entitled to all future dividends.

We doubt whether this argument would have been good even if the assignments had remained in their original form; that is, without the addition of the clause beginning "to the end that." It is true that literally they were present transfers; and that, in spite of the introductory clause, "subject to the right of the undersigned first to receive" his principal and interest, they perhaps more properly imported an immediate transfer of the assigned interest than a conditional transfer held in abeyance until the assignor should be paid in full. But there are serious difficulties in application, if the documents are read that way. Until June, 1936 when the O'Connor action was dismissed, and possibly even until the judgment was finally affirmed, the parties hoped and probably expected that other banks would join in the settlement; if they did, they were to receive their clearing house percentages of the claims, regardless of the declaration of any dividends after the first assignments and before they joined. That is what actually happened in the plaintiff's case. However, if the banks' present argument is right, the payment of any dividend changed the proportion between the assigned and the retained parts of the claims; e.g., after the dividend of November 29, 1935, the ten banks' proportion of claims, as they stood, was no longer 45.3 per cent, but about 57 per cent. It would not therefore carry out the arrangement to construe the plaintiff's assignments of April, 1936 as transferring only 14.5 per cent of the face of the claims taken as of that date. If the plaintiff's assignments effected an immediate transfer, the percentage transferred must have been intended to be applied to the amount of the claims as they were on October 18, 1934, when the assignments to the ten banks had been executed. The only other alternative would be that the assignments, whenever executed, transferred nothing immediately but were conditional in legal operation upon the depositors' receiving 100 per cent of their principal "from all sources." The first alternative has absolutely no support in any

380

of the language used in the plaintiff's assignments or in the contract; it must be made out of whole cloth. We need not say that this would be an insuperable objection if the prevailing intent could only so have been realized; but it would certainly do great violence to the language chosen, far more than the second alternative of interpreting the clause, "subject to," as suspending any transfer until the condition was fulfilled. And when one considers that other banks might have come in even after the dividend of August 13, 1937, the unlikelihood is very great that all assignments were intended to incorporate by implication a provision that the amount of the claims should be read as of the date of the first assignments. At least it is plausible that the "subject to" clause was meant to impose a condition.

However, we are not forced to decide the question; the whole force of the banks' argument—so far as it has any force—depends upon the assumption that the clause "to the end that" etc., so far contradicted the words of grant that we ought in effect to delete it. If that is not true, if on the contrary the original form of the assignment was itself equivocal, particularly if its preferred construction, all things considered, was to make any transfer conditional upon the fulfillment of the "subject" clause, the argument falls to the ground. The clause, "to the end that," then makes it plain that what was before a doubtful, though preferred, reading was that which the parties certainly intended; for there cannot be the least doubt as to the meaning of the clause, "to the end that," taken by itself. These words are too plain for ingenuity to obscure or exposition to clarify: "after the undersigned shall have received from all sources one hundred per cent. of the principal amount aforesaid, the trustee shall take by way of subrogation 45.3 per cent. of any dividends thereafter payable upon the undersigned's claim." Indeed, it would be an injustice to the draftsman to treat them as inconsistent with the plain purport of the assignment as a whole; on the contrary the clause is an exegetical gloss entirely harmonious with its better interpretation. Besides, even if it had not been, it would be altogether unwarranted for us to strike it out. After interpretation has called to its help all those facts which make up the setting in which the words are used, the words themselves remain the most important evidence of intention; to put them altogether aside may at times be necessary but it always somewhat savors of usurpation; and when words have, as here, been deliberately added to clarify what had been written before, only the most stringent and inescapable necessity can justify such a course.

The banks protest against the result as a reductio ad absurdum. It is preposterous, they say, to allow the depositors to get a dividend because not all of the banks joined in the settlement, when confessedly they would have got none if all had done so. The plausibility of this disappears, however, in the light of the possibilities which confronted the parties. Nobody knew how many of the banks would join, or whether those who did not might not escape all liability, as in the end they did. Even if all did join, it was supposed, as we have seen, that $6,331,000 would not make the depositors whole; and so far as any did not join, the deficiency would be even larger. The depositors would not recover in full except in the altogether unexpected event that the deficiency had been so much overestimated that the percentages paid in by those banks who did join would be enough to make it up. That did indeed turn out to be the case, but it is no objection to an award to the depositors of a share in the small dividend which will be declared. The chance they took that they would not be paid in full much outweighed the chance they had of recovering anything by way of interest. It is apparently true that that chance was discussed between the banks and the receiver and his attorney, and that it was agreed that in no circumstances should the depositors get more than their principal. Possibly, if the receiver had been the depositors' agent to settle with the banks, these negotiations might overcome the written words, though in view of the care and detail with which the documents were prepared, and in view especially of the later deliberate interpolation of the clause "to the end that," it is extremely probable that the parties meant them to be the exclusive source for ascertaining their intent. However, we need not go into that question. The receiver did not profess to speak for the depositors; he merely drew up the papers and submitted them for their independent action. We do not see how, upon any theory, what he or his attorney said during their preparation can change the meaning which a court should impute

to the words used. We therefore hold that the judge was right upon the principal issue.

■ The remaining points require little discussion. The first arises from the fact that it was impossible for the receiver to calculate closely enough in advance to pay out all the money which he had received from the banks for assenting depositors. A surplus remains which the judge ordered to be distributed in the same proportions as the future dividends, on the notion that if the receiver had succeeded in making exact distribution, the future dividends distributed to depositors would have been correspondingly increased. We think that this was right. If the dividends declared were in fact fixed with an eye to what the banks had already paid so as to bring out an 100 per cent payment of principal on December 5, 1939, this was obviously the correct disposition of the surplus. On the other hand, if the same dividends would have been declared regardless of the banks' payments, and if the surplus had also been distributed, the depositors would have received a surplus in excess of their principal and would have been accountable to the banks for 59.80 per cent of it.

■ The last question is as to the claim of Federal Debenture Corporation, a creditor of the Harriman Bank, but not a depositor. Its position is that the payments made by the banks should be brought into hotchpot with the dividends paid to depositors, and that creditors who were not depositors must be made good out of any future dividends to the extent that they would have shared in the payments made by the banks if these had been dividends. This argument can only rest upon the theory that no contract could lawfully be made by the depositors with the banks to the exclusion of the other creditors. It is of course true that the depositors could not secure to themselves a preference in the distribution of any part of the Harriman assets, and if the payments by the banks were such, the position would have strength. But the payments were not part of the Harriman assets; they were made in settlement of an asserted contract in which the banks had promised to indemnify the depositors alone, not all the creditors of the Harriman Bank. There would have been no unlawful preference, if the banks had agreed to do so; the other creditors could have no complaint that the banks were in-terested only in protecting the depositors. They had as little rightful share in such a contract as they would have had in the depositors' recovery for a tort committed against them collectively by the banks.

Judgment affirmed.